James I. GRANN, Johnny E. Winston, Gerald R. Whitfield, John F. Stippl, Francis L. Retelle, Steven R. Reinstra, Richard J. Miller, Robert M. Lombardo, Steven A. Koecke, Rudolph J. Jergovic, Bernard D. Hebard, William S. Gilfroy, Dennis A. Gerfen, Lemuel B. Graser, Robert J. Faust, and Kenneth D. Couture, Plaintiffs-Appellees-Cross-Appellants,

v.

CITY OF MADISON, a municipal corporation, Defendant-Appellant-Cross-Appellee.

Nos. 82–2887, 82–3098.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1983.

Decided June 25, 1984.

Certiorari Denied Oct. 15, 1984. See 105 S.Ct. 296.

Eunice Gibson, Asst. City Atty., Madison, Wis., for defendant-appellant-cross-appellee.

Barrett J. Corneille, Bell, Metzner & Gierhart, S.C., Madison, Wis., for plaintiffs-appellees-cross-appellants.

Before CUMMINGS, Chief Judge, PELL and WOOD, Circuit Judges.

PELL, Circuit Judge.

A combination of facts, apparently unique, presents us with a case of first impression regarding the relationship between federal enforcement of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and state enforcement of state fair employment laws. This appeal requires that we review the district court's conclusion that defendant violated the federal rights of recently promoted male detectives when it complied with an order by the Equal Rights Division of the Wisconsin Department of Industry, Labor, and Human Relations (DILHR) requiring defendant to raise the salaries of female detectives to the level paid to the more senior male detectives. Defendant claims that the court erred in finding sex discrimination, while plaintiffs urge that the court erred in not finding that the discrimination began at an earlier date and in refusing to award back pay.

## I. FACTS

Until 1972 the City of Madison hired only males as police "officers," and allowed only males to compete for positions as detectives. Women were only employed as policewomen, policewomen I, and policewomen II. Detectives were compensated at Pay Range 5, while policewomen II were compensated at Pay Range 4. Police officers seeking to become detectives had to pass a competitive examination, while females obtained the rank of policewomen II by serving for a specified period of time on the force. Policewomen were employed exclusively in the Crime Prevention Bureau and were not allowed to attend police training classes or perform patrol duties.

Several events in 1972 altered the structure of the Madison police department. In that year Title VII of the Civil Rights Act of 1964 was amended to cover municipal employees. Equal Employment Act of 1972, Pub.L. No. 92–261, 1972 U.S.Code Cong. & Ad.News (86 Stat.) 122. In addition, the city implemented recommendations made by a consultant in 1971, which included lowering the pay of detectives to

Pay Range 3 to eliminate some of the pay differential between detectives and patrol officers. The new pay only applied to entry level detectives, all existing detectives were "grandfathered" at Pay Range 5 and retitled "detective supervisors." For the sake of clarity we will refer to those officers promoted after the new pay structure was adopted, and consequently paid at Pay Range 3, as "detectives." Those paid at Pay Range 5 will be referred to as "detective supervisors."

In 1973 a new police chief combined the Detective Bureau and the Crime Prevention Bureau to form the Investigative Services Bureau. The new bureau employed detectives, detective supervisors, and policewomen. In 1974 all policewomen II's were retitled "detective 2." Consequently, on that date, the bureau contained detectives, paid at Pay Range 3, detectives 2, paid at Pay Range 4, and detective supervisors, paid at Pay Range 5. All of the various detectives performed the same work. The distinguishing characteristics were the date the officer became a detective and the detective's sex. The city intended to phase out the position of detective 2 and detective supervisor through attrition and promotion.

Plaintiffs, male detectives, point to two events to support their claim of sex discrimination. The first is the promotion of Belle Stephenson to policewomen II (later retitled detective) in 1974 after three years of satisfactory service as policewomen I. The second occurred in 1975 when Mary Otterson and Mary Ostrander, both detectives 2, filed a discrimination complaint with the DILHR. The city denied that it was guilty of discrimination and contested the charges. After conducting a hearing DILHR ordered the city to classify the women as detective supervisors and pay back pay. The city complied with the order, and in fact reclassified all detectives 2 as detective supervisors.

## II. PREVIOUS LITIGATION

On October 21, 1974, Detective Croal (Pay Range 3) filed a complaint of sex discrimination with DILHR, alleging that the promotion of Stephenson to detective 2 (Pay Range 4) was an act of sex discrimination. After a hearing on the matter the department examiner recommended dismissal of Croal's complaint. On November 10, 1978, the Labor and Industry Review Commission dismissed the complaint. Croal filed a petition for review in Dane County Circuit Court. On February 27, 1980, the court affirmed DILHR's dismissal of Croal's complaint. Croal voluntarily dismissed his appeal from this decision as it had been untimely filed.

In February of 1979, plaintiffs filed complaints with DILHR. In April, 1979, they filed complaints with the United States Equal Employment Opportunities Commission (EEOC). The EEOC issued an initial determination of no probable cause on plaintiffs' complaint in June, 1979. Both Croal and plaintiffs received right-to-sue letters and filed actions in the district court. The cases were consolidated and Croal's complaint was dismissed as barred by the res judicata effect of his unsuccessful action in state court. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

## III. DECISION OF THE DISTRICT COURT

The district court considered and rejected plaintiffs' claim that the promotion of Stephenson to policewomen II after the department had officially ended sex discrimination violated Title VII. The court found that the promotion was a legitimate "red circle" as defined later herein, as it protected Stephenson's seniority and pay in the department. The court, however, found that the department's reliance on the DILHR order was not a defense to a claim that promotion of the women to detective supervisors violated Title VII and the Equal Pay Act, 29 U.S.C. § 206(d).[1] The

1. The parties agreed that the district court should treat the Equal Pay Act claim and the Title VII claim as "essentially the same." Title

VII and the Equal Pay Act are to be construed "in harmony," *Orhood v. Board of Trustees*, 645 F.2d 651, 654 (8th Cir.1981), and in a case such

court, nonetheless, refused to grant plaintiffs' back pay. Defendant claims that the court erred in rejecting its claim that reliance on the DILHR order is a defense to the sex discrimination claim, while plaintiffs claim that the court erred in not finding that the discrimination began with Stephenson's promotion and not ordering back pay from that date.

## IV. RES JUDICATA

We first consider whether plaintiffs are in any way precluded from litigating their claim concerning Stephenson's promotion by Detective Croal's unsuccessful efforts. Under 28 U.S.C. § 1738 "[t]he ... judicial proceedings of any court of any such state ... shall have the same full faith and credit in every court within the United States and its territories and possessions as they have by law or usage in the courts of such state." We therefore must give "the same preclusive effect to state court judgments that these judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982). Under *Kremer*, which held that a state court judgment on a state fair employment law claim should be given preclusive effect in a federal Title VII action if it would preclude a second state proceeding, it is clear that Detective Croal could not relitigate his claim in federal court. Defendant seeks to extend this preclusive effect to plaintiffs, who were not parties to Croal's suit and have not maintained an action in state court.[2]

The most obvious problem in applying res judicata to plaintiffs' claim is the requirement that there be an identity of parties or their privies before a Wisconsin Court will apply the judgment from the first suit to bar a second suit. *Barbian v. Linder Brothers Trucking Co.*, 106 Wis.2d 291, 296, 316 N.W.2d 371, 374 (1982); *Lei-*

*mert v. McCann*, 79 Wis.2d 289, 294, 255 N.W.2d 526, 529 (1977). Defendant cannot claim that Croal and plaintiffs are really the same people as they clearly are not. Defendant does contend, however, that plaintiffs should be treated as being in privity with Croal because their rights stem from being detectives, just as Croal's rights stemmed from being a detective.

■ Defendant misconstrues the concept of privity. "The Wisconsin Supreme Court defines privies as those who succeed to the ownership of property or some right or interest therein under one of the parties to the litigation." *Falk v. Falk Corp.*, 390 F.Supp. 1276, 1282 (E.D.Wis.1975). In *Falk* the decedent had unsuccessfully litigated his right to designate someone other than his first wife as beneficiary of his deferred compensation plan. After decedent's death his second wife tried to relitigate his claim that he had the power to designate her as beneficiary. The court was clearly correct in holding that she was in privity with her late husband as her right to be designated beneficiary was dependent upon his power to so designate her. Contrary to defendant's claim, *Falk* is not analogous to the present situation. Plaintiffs' situation may be factually identical to Croal's, but they did not derive their positions as detectives from him nor did they obtain their right not to be discriminated against on the basis of sex from Croal. Croal's existence is irrelevant to the validity of plaintiffs' claim and he had no power to bind plaintiffs through his actions. Furthermore, there is no evidence that plaintiffs were in fact involved in Croal's suit. In short, there is no reason to believe that a Wisconsin court would succumb to the temptation to treat Croal's suit as a class action after the fact, and we may not do so ourselves. Plaintiffs were not in privity with Croal and cannot be bound by his unsuccessful litigation.

as this we will treat the two statutes as proscribing essentially the same conduct.

**2.** Defendant admits that under any view of the law those claims involving the promotion of

detectives 2 to the rank of detective supervisor, which occurred after Croal filed his complaint, cannot be barred by Croal's litigation.

## V. PROMOTION OF BELLE STEPHENSON

Belle Stephenson began working as a policewoman in 1958. She worked her way up the available ranks and then resigned in 1965. In 1966 she rejoined the force and began to work her way back up to policewoman II. The department officially ended sex discrimination in 1973, but promoted Stephenson to policewoman II in 1974 although that position was not open to males. Plaintiffs claim that this promotion was an act of sex discrimination as they were not eligible for a similar promotion, which carried with it a raise in pay. The district court rejected this claim after finding that failure to give Stephenson her time in grade promotion because sex discrimination had ended would have placed the burden of sexual equality on a victim of discrimination. The court concluded that the promotion was therefore a legitimate "red circle."

Plaintiffs argue that a promotion cannot be a legitimate red circle. While we recognize that this time in grade promotion is not the typical form in which a red circle is found, we think that in the atypical situation presented by this case the promotion served the purpose of a red circle and was legitimate.

■ The practice of red circling is common when remedying discrimination that has kept minority groups in low paying jobs that present no opportunity for advancement. In this situation the employer may—and in many cases must—maintain, or red circle, the victimized employees' salary when they transfer to a lower paying job that provides the training necessary for advancement. *Swint v. Pullman-Standard*, 539 F.2d 77, 100 (5th Cir.1976), *appeal from remand*, 624 F.2d 525 (1980), *reversed and remanded on other grounds*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir.1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139; *Rogers v. International Paper Co.*, 510 F.2d 1340 (8th Cir.1975), *vacated on other grounds*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29; *United States v. Bethlehem Steel Corp.*, 446 F.2d 652 (2d Cir.1971). Red circling allows the employee to achieve a position he would already have attained but for the discrimination without being forced to suffer any economic loss. The rationale is that the victim of discrimination should not bear the costs associated with remedying the situation.

■ Although the promotion of Stephenson to policewoman II does not appear to be a red circle in the customary sense in that the department went beyond maintaining her salary and gave her a raise, the facts in this case support this extension of the usual application of a red circle. During the period when the police department discriminated on the basis of sex, a policewoman such as Stephenson was not only denied promotions, she was also denied the opportunity to acquire the skills necessary to perform more demanding police work. Policewomen, however, were allowed to reach Pay Range 4 through length of service, rather than through examinations as the men did. Stephenson was just shy of earning her time in grade promotion—in fact she had already once "made the grade" but had resigned and then had begun again—when discrimination officially ended. Removing the official barriers did not place Stephenson in the same position she would have occupied had she never been subject to discrimination to begin with, however, but rather left her lacking the skills and experience any male would have acquired in the same time and now also lacking the benefit of her soon due promotion resulting from her length of service. The department, by granting Stephenson her promotion, recognized that discrimination is not effectively remedied by removing her length-of-service benefit earned by her while not placing her in the position she would have occupied but for the discrimination.

Because we find that Stephenson's promotion was a red circle, we need not address defendant's remaining arguments concerning the procedural bars to plaintiffs' recovery on this theory.

## VI. PROMOTION OF DETECTIVE 2 TO DETECTIVE SUPERVISOR

The final issue we must confront is also the most difficult, did the district court err in holding that reliance on a state agency's order cannot be a defense to a Title VII claim? The court, citing our decision in *Williams v. General Foods Corp.*, 492 F.2d 399 (7th Cir.1974), ruled that reliance on a state law can never be a defense to a claim of sex discrimination. We think that the court read *Williams* more broadly than the opinion warrants and that a more thorough analysis of the relationship between state enforcement of state fair employment laws and federal enforcement of Title VII is required before the issue can be resolved.

The Civil Rights Act of 1964 contains two provisions regarding the effect of the new federal law on state laws. Section 708 of Title VII states:

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful-employment practice under this subchapter.

42 U.S.C. § 2000e–7.

Similarly, Section 1104 of Title XI, which contains miscellaneous provisions of the Act, provides that:

Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provisions thereof.

42 U.S.C. § 2000h–4.

The legislative history, case law, and structure of the enforcement provisions of Title VII make clear that Congress intended that the states play an active role in ending discrimination and that these two "savings" provisions should not be construed to undermine state efforts. Enforcement of Title VII is premised on the belief that the states should be given the first opportunity to deal with cases of discrimination. Section 706 of Title VII requires that when the state within which the employment discrimination took place has a state law prohibiting the unlawful employment practice and an agency authorized to enforce the law, then the complainant must pursue state remedies and allow the state sixty days to obtain relief before filing charges of violation of Title VII with the EEOC. 42 U.S.C. § 2000e–5(c). Commenting on this provision, Senator Humphrey stated:

We recognize the good sense of permitting the appropriate State agencies ample time to resolve disagreements arising under Title II and IV and VII, in particular, through voluntary conciliation mediation. We recognize that many States already have functioning antidiscrimination programs to insure equal access to places of public accommodation and equal employment opportunity. We sought merely to guarantee that these States—and other States which may establish such programs—will be given every opportunity to employ their expertise and experience without premature interference by the Federal Government.

\* \* \* \* \* \*

In instances where the States are unable or unwilling to provide this protection, the Federal Government must have the authority to act. This is the formula which we sought to implement.

110 Cong.Rec. 12724–25 (1964) (statement of Sen. Humphrey). Senator Humphrey termed the enforcement provisions of Title VII a "States rights bill" and a "States responsibilities bill." *Id.* Senator Clark commented that: "Title VII meshes nicely, logically, and coherently with the State and city legislation already in existence." 110

Cong.Rec. 7205 (1964) (statement of Sen. Clark).

Judicial interpretations bear out this reading of Title VII. In *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980), the Court ruled that Section 706(k), which allows a court to grant a reasonable attorney's fee to a prevailing party "[i]n any action or proceeding" under Title VII, 42 U.S.C. § 2000e–5(k), authorized an award of fees for work done in prosecuting an employment discrimination claim through the required state proceedings even when no federal proceedings take place. In holding that state proceedings are part of an action or proceeding under Title VII the Court considered the role the states play in furthering the policy of Title VII and concluded that:

It is clear from this scheme of interrelated and complementary state and federal enforcement that Congress viewed proceedings before the EEOC and in federal court as supplements to available state remedies for employment discrimination. Initial resort to state and local remedies is mandated, and recourse to the federal forums is appropriate only when the State does not provide prompt or complete relief.

447 U.S. at 65, 100 S.Ct. at 2031; *see also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (§ 706 of Title VII is intended to screen from the federal courts those cases that could be settled through state or local enforcement); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974) ("Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.").

Congress clearly intended to encourage state protection of civil rights in the area of employment discrimination, without abandoning the power to use federal enforcement mechanisms when state remedies prove ineffective. Section 708 of Title VII and Section 1104 of Title XI were designed to accomplish this goal by saving those state laws that were consistent with the goals of Title VII while invalidating those that hindered protection of civil rights. With this in mind, we will turn to examine the district court's resolution of plaintiffs' claim.

The district court read Section 708 and our decision in *Williams v. General Foods Corp.*, 492 F.2d 399 (7th Cir.1974), as eliminating reliance on any state law as a defense in a Title VII action. As we have already observed, however, Section 708 does not preempt all state laws, only those that are inconsistent with the goals of Title VII. *Williams* is consistent with this proposition. In *Williams* the employer relied on the Illinois Female Employment Act to justify discrimination against female employees. We rejected this defense because "protective" legislation such as the Illinois Female Employment Act, which prohibited women from working more than forty-eight hours a week or nine hours a day, acts to perpetuate sex discrimination in direct contravention of the policy behind Title VII and therefore is not saved by Section 708 or Section 1104. *Williams*, 492 F.2d at 404. *Williams*, however, does not stand for the proposition that all state legislation regarding sex discrimination is to be discarded. Scrapping state laws that seek to eliminate, rather than perpetuate, discrimination is not required by Title VII and would totally undermine the dual enforcement system envisioned by Congress.

Several courts have noted the distinction between protective legislation, which is simply legislated discrimination, and state fair employment laws, which are an integral part of Title VII's enforcement scheme. *See LeBlanc v. Southern Bell Telephone and Telegraph Co.*, 333 F.Supp. 602, 609 (E.D.La.1971), *aff'd*, 460 F.2d 1228, *cert. denied*, 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed.2d 257 (1972) (Title VII intended to save state antidiscrimination laws, but not protective legislation); *Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219 (9th Cir.1971); *Local 246, Utility Workers Union of America v. Southern California Edison Co.*, 320 F.Supp. 1262 (C.D.Ca.

1970). In a related area several courts have held that the Employee Retirement Income Security Act (ERISA), which explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," 29 U.S.C. § 1144, does not prohibit application of state antidiscrimination laws to employee benefit plans. Despite the explicit preemption the courts have balanced this provision against ERISA's statement that: "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). After examining the history and structure of Title VII the courts have determined that "the federal scheme contemplates and encourages enforcement of state fair employment statutes as an integral component of the federal statutory scheme." *Bucyrus-Erie Co. v. Department of Industry, Labor and Human Relations*, 599 F.2d 205, 210–11 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980); *see also Westinghouse Electric Corp. v. Maryland Commission on Human Relations*, 520 F.Supp. 539 (D.Md.1981). In both of these cases the courts concluded that the need for enforcement of state fair employment laws in the enforcement scheme of Title VII outweighed the need for uniform regulation of employee benefit plans.

It is clear to us, then, that the district court's analysis was too simplistic in accepting a *per se* approach to invalidating state employment laws. A proper analysis requires that the state law in question be examined to determine whether it is the type of law Congress expected to act as the first line of offense against employment discrimination or whether it itself is a cause of discrimination.

The city here promoted the female detectives to detective supervisors after unsuccessfully challenging charges of discrimination filed with DILHR. DILHR acts pursuant to the Wisconsin Fair Employment Act. Wis.Stat. §§ 111.31–111.395. The Fair Employment Act prohibits employment discrimination on the basis of sex, Wis.Stat. § 111.321, and authorizes DILHR to conduct hearings and issue orders necessary to effectuate the purpose of the Act, Wis.Stat. § 111.39. In many respects the Fair Employment Act is identical to Title VII. In some areas, not pertinent here, the Act offers protection to groups not covered by Title VII. The one difference between the two pieces of legislation that is worth noting is in the date each began to prohibit sex discrimination against municipal employees. The Fair Employment Act proscribed this conduct in 1961,[3] while Title VII did not extend protection to these employees until 1972. Although this difference may account for the events that led to this law suit—DILHR was able to take action because the city's discriminatory policy violated state law, but the city's policy did not violate Title VII until 1972, at which point it had grandfathered the existing detectives at the higher pay for nondiscriminatory reasons—it does not alter the validity of the Fair Employment Act. It would be ironic indeed to hold that Congress,

3. Until 1975 the Fair Employment Act did not specifically include the State or its agencies in the definition of "employer," but rather simply excluded "social club and fraternal society" employers from its proscriptions. In 1975 the Wisconsin Supreme Court ruled that this negative definition of employer did not include the State or its agencies, and that the prohibition against employment discrimination by any "person" meant only those entities defined as a "person" under Wis.Stat. 990.01(26), which included "all partnerships, associations, and bodies politic and corporate." The Supreme Court held that the State is not both politic *and* corporate and so is not included in the definition of "person." *State ex rel. Department of Public Instruction v.*

*ILHR*, 68 Wis.2d 677, 229 N.W.2d 591 (1975). In 1975 the definition of employer was amended to include the State and its agencies. Wis. Laws c. 31 (1975). None of this affects the Fair Employment Act's applicability to municipal employers such as defendant. In a case involving defendant the Wisconsin Supreme Court held that a municipality is included within 990.-01(26) as it is both a body politic and corporate. *City of Madison v. Hyland*, 73 Wis.2d 364, 243 N.W.2d 422 (1976). The Act was amended in 1961 to cover sex discrimination. Wis.Laws c. 529 (1961). There appears to be no question, then, that DILHR was justified in pursuing the females' claim against the city.

which never indicated any intention of requiring that state fair employment laws be identical to Title VII, intended to invalidate state laws that extend their protection into more work places than does Title VII. In protecting municipal employees at an earlier date the Fair Employment Act did not become "inconsistent" with Title VII, nor did it require "the doing of any act which would be an unlawful employment practice" under Title VII, and we cannot agree with the district court that it suffers the same fate as discriminatory protective legislation under Sections 708 or 1104.[4]

■ Once it is clear that the enforcement of Title VII is premised upon the effective enforcement of state laws such as the Fair Employment Act, the only rational resolution of the issue posed by plaintiffs is to hold that reliance on a state agency's order enforcing the right of a protected group to be free from discrimination in employment is an absolute bar to a suit by fellow employees claiming that the action required by the remedial order constitutes a violation of Title VII.

Although we have located no cases dealing with reliance on a state agency's remedial order, several cases have confronted analogous claims by employees adversely affected by consent decrees entered into by their employers and a second group of employees. In *EEOC v. McCall Printing Corp.*, 633 F.2d 1232 (6th Cir.1980), black employees complained in 1966 that racial discrimination excluded them from the lines of promotion. A settlement was reached that granted them access to the lines of promotion, but did not grant them retroactive seniority. In 1971 female employees complained about sex discrimination. Once again, a conciliation agreement was reached, but this time the company granted the women retroactive seniority. The

agreement was signed by the EEOC and approved as a consent decree by the court in 1973. The black employees, who were adversely affected by the grant of seniority to the women, complained that this was an act of race discrimination. The court recognized that the black employees had been hurt by the consent decree, but noted that the same could be said of any resolution of a Title VII claim that included a grant of retroactive benefits. To allow consent decrees to be attacked by disappointed third parties would undermine the employer's motivation to settle discrimination cases and would reopen old claims every time a new group of victims was made whole. Accordingly, the court held that absent bad faith, "the conciliation agreement and consent decree cannot form the basis of a valid Title VII action." *Id.* at 1237.

In *Dennison v. City of Los Angeles Department of Water and Power*, 658 F.2d 694 (9th Cir.1981), non-minority employees unsuccessfully objected to the district court's approval of a consent decree that established an affirmative action program for minority employees. The non-minority employees then filed suit seeking compensation for the harm caused by the consent decree. The Ninth Circuit rejected plaintiffs' claim for two reasons; first, the suit constituted an impermissible collateral attack on the decree, and second, allowing non-minority employees to sue for compensation would place the city in the impossible situation of facing suit by minority employees if it fails to correct past discrimination and facing suit by non-minority employees if it corrects past practices. Similarly, in *Stotts v. Memphis Fire Department*, 679 F.2d 541 (6th Cir.1982), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), the Sixth Cir-

---

4. The EEOC apparently views the work done by DILHR as consistent with the goals of Title VII. The Commission designates state agencies that qualify under 706(c) of Title VII as "706 Agencies." 29 C.F.R. § 1601.70(a) (1983). The Commission also certifies certain 706 Agencies that have performed well in the past, and "the effect of such certification is that the Commission shall accept the findings and resolutions of des-

ignated 706 Agencies in regard to cases processed under contract with those agencies ... without individual case-by-case substantial weight review by the Commission." 29 C.F.R. § 1601.75 (1983). The Equal Rights Division of the Wisconsin Department of Industry, Labor, and Human Relations is a 706 Agency, 29 C.F.R. § 1601.74 (1983), certified by the Commission, 29 C.F.R. § 1601.80 (1983).

cuit reasoned that recognition of a consent decree that rectifies past discrimination against minority employees as an actionable wrong against non-minority employees would place employees in an untenable position. The court accordingly held that "a reasonable consent decree does not adversely affect *any* legally protected interest of a non-minority." *Id.* at 558 [5] (emphasis in original). *See also Freeze v. ARO, Inc.,* 503 F.Supp. 1045 (E.D.Tenn.1980) (consent decree settling claims of black employees cannot be the basis for Title VII suit by white employees). *But cf. United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983) (district court denied white firefighters' motion to intervene in Title VII suit between black firefighters and county as untimely; affirmed on appeal as denial did not prejudice white firefighters as they could still challenge action taken pursuant to decree through their own Title VII suit. The court noted that the question whether county's reliance on decree to justify action constituted a defense was "difficult" and did not rule on it.)

A state agency's order that rectifies discrimination should no more be the basis for a Title VII suit than a consent decree entered into during a Title VII suit.[6] As an initial matter it would mean that an employer who settles the dispute at the state level is in a much worse position than one who litigates until the federal level and then settles. In addition, acceptance of plaintiffs' position would place the police department in the untenable position envisioned in *Dennison* and *Stotts;* the department could obey the remedial order and face Title VII liability or ignore the order and face sanctions. We do not think that it is reasonable to expect the department, faced with this situation, to solve it by simply paying all detectives at Pay Range 5.

As in *McCall Printing Corporation, Dennison,* and *Stotts,* the relief the department was ordered to provide to the women was reasonable. The policewomen were clearly the victims of sex discrimination for an extended period of time and were entitled to be placed in the position they would have occupied but for the discrimination. This relief is authorized by the Fair Employment Act, Wis.Stat. § 111.39, and comports with relief available to victims of sex discrimination under Title VII. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S.

**5.** The recent decision by the Supreme Court in *Stotts* does not contradict this position. In *Stotts* the city and the union objected to the district court's modification of a consent decree. The decree authorized an affirmative action program for hiring minority employees, but said nothing about layoffs. When economic problems forced the city to make layoffs, it chose to follow its existing seniority system. Minority employees sought relief from the court. The court read the decree as authorizing protection for minority employees in this situation. The Supreme Court disagreed, holding that the decree did not authorize the court to enjoin the operation of the city's bona fide seniority system and that the court had no power to modify the decree over the city's objection when there had been no proof that the minority employees had each been a victim of actual discrimination. The Court did not hold that non-minority employees can attack a consent decree that remedies the effects of proven discrimination. In the case before us the women were clearly the victims of discrimination and the city agreed to the relief provided. Furthermore, *Stotts* involved seniority rights, which cannot be awarded to one employee without adversely affecting the rights of other employees, while the male detectives here lost nothing when the city remedied the discrimination against the women.

**6.** Plaintiffs claim that *McCall Printing Corporation* has been overruled by *W.R. Grace & Co. v. Local Union 795, International Union of the United Rubber, Cork, Linoleum and Plastic Workers,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), in which the Court held that an employer who enters into a consent decree that conflicts with a collective bargaining agreement has to bear the expense of compliance with both. The Court reasoned that the company, by voluntarily entering into two agreements, had created its own dilemma. The Court, citing *McCall Printing Corporation* and *Dennison,* specifically stated that it was not dealing with a judicial order providing "relief to discriminatees under Title VII or other law." *Id.* at 2184 n. 9. It is clear, then, that the Supreme Court did not consider the situations analogous and did not overrule *McCall Printing Corporation.*

747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). Plaintiffs here have less to complain of than employees affected by a grant of seniority to past victims of discrimination. In that situation the relief awarded the victims directly affects the value of other employees' seniority, yet that is not enough to make a retroactive grant of seniority an improper remedy. *Franks,* 424 U.S. at 775, 96 S.Ct. at 1269. Here the salaries received by the new male detectives were not lessened by the raise given to the women.

■ Plaintiffs raise several complaints that, they argue, undercut the department's reliance on DILHR's order in this case. First, plaintiffs complain that the department promoted all five women when only two had filed complaints with the agency, and the promotion of three of the women therefore cannot have been due to the remedial order. We do not agree that anything in Title VII commands us to encourage an employer, faced with an order to make whole several members of a group of discriminatees, to litigate the rights of other members of that group. To adopt this position would be to thwart the goal of Title VII of encouraging settlement of complaints through voluntary compliance. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). The department's reliance on the remedial order is not undercut by its voluntary action concerning those women who had not yet filed complaints but who had equally meritorious claims of discrimination.

Plaintiffs also argue that DILHR was not justified in ordering the remedial action for the actual claimants in this case as there was no showing that the women would in fact have become detectives had there been no discrimination. Although the basis for the agency's action is not in the record and plaintiffs have offered no reason to suspect the ability of the women to become detectives absent discrimination, we do not need to examine the sufficiency of the proof presented to the agency. Under Wisconsin law it appears that plaintiffs

could have become parties to the agency's hearing, Wis.Stat. §§ 227.01(6), 227.064, and clearly could have obtained judicial review of the agency's actions in state court, Wis.Stat. §§ 111.37, 227.16. Had plaintiffs taken advantage of these opportunities the claim they now raise could have been disposed of properly and the state court's decision would have had collateral estoppel effect here. *Kremer v. Chemical Construction Co.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). We see no more reason to permit a collateral attack on the agency's order than we do to permit a collateral attack on a consent decree.

■ In conclusion, we hold that the purposes of Title VII will best be served by showing due deference to a state agency's enforcement of a state fair employment law. In this case we hold that the department did not violate Title VII by complying with DILHR's order remedying sex discrimination. We also note that plaintiffs have not really suffered at the hands of DILHR. Plaintiffs are in Pay Range 3 not because of their sex but because they had the misfortune to become detectives after the department decided to make the position less lucrative for all newcomers. In fact, until DILHR ordered the department to promote the women, only men were paid at Pay Range 5. In this situation the department is not "getting away with" sex discrimination behind the facade of compliance with the remedial order.

For the reasons stated in this opinion the decision of the district court finding that the promotion of Belle Stephenson was not discriminatory is AFFIRMED, and the court's finding that the reclassification of detectives 2 to detective supervisors was discriminatory is REVERSED. The parties shall bear their own costs.