Elmer BRITTON, et al.,
Plaintiffs-Appellants,

v.

SOUTH BEND COMMUNITY SCHOOL CORPORATION, et al.,
Defendants-Appellees.

No. 84–2841.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1985.

Decided Oct. 21, 1985.

Daniel H. Pfeifer, Sweeney & Pfeifer, Donald E. Wertheimer, Harry Heppenheimer & Assoc., South Bend, Ind., Michael Carvin, U.S. Dept. of Justice, Washington, D.C., amicus curiae, for plaintiffs-appellants.

Franklin A. Morse, II, Barnes & Thornburg, South Bend, Ind., Elliot M. Mincberg, Hogan & Hartson, Washington, D.C., for defendants-appellees.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This is a "reverse discrimination" case in which we are required to determine whether a clause in a collective bargaining agreement between a teachers' union and a school district that prohibits layoffs of "minority" teachers, and layoffs of white teachers pursuant to that clause, violate either the Equal Protection Clause of the Fourteenth Amendment or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Although the district court relied on its earlier decision in *Janowiak v. Corporate City of South Bend,* 576 F.Supp. 1461 (N.D.Ind.1983), *rev'd,* 750 F.2d 557 (7th Cir.1984), which we reversed after the district court issued its opinion in this case approving the clause, 593 F.Supp. 1223 (N.D.Ind.1984), we affirm the district court.

I.

A.

Between the years 1980 and 1983 teacher employment in the South Bend public schools was governed by a collective bargaining agreement between the South Bend Community School Corporation (the "School Corporation") and the National Education Association of South Bend, the exclusive bargaining representative of teachers in the South Bend public school system. Article XXIII of the 1980–83 Agreement was entitled "Reduction in Force—Recall" and provided in Section 9: "No minority bargaining unit employee shall be laid off." The term "minority" in this "no minority layoff provision" (sometimes simply the "provision" or "clause") referred only to black teachers. The clause had not appeared in any prior collective bargaining agreement between the School Corporation and NEA-South Bend.

Prior to and during the negotiations over the 1980–83 Agreement, the School Corporation anticipated the possibility of future layoffs because of declining school enrollment and budgetary constraints. It proposed the no minority layoff provision to protect the gains it had made in hiring black teachers to reach the goal, mandated by a prior consent decree, of having the minority representation on the teaching staff approximately equal that of the minority student population. The negotiations leading up to the 1980–83 Agreement lasted two weeks. Representatives of NEA-South Bend met with the teachers after the negotiations concluded to discuss the terms of the Agreement. Article XXIII, Section 9 was discussed at that meeting. 593 F.Supp. at 1226. The exact language of the provision was not presented at the meeting, but the document distributed to the teachers listed changes in articles from previous contracts and clearly indicated that the clause would prefer blacks over whites in the event of layoffs. Teachers who were not members of the NEA-South Bend (about one-fourth of the South Bend teachers) were allowed to attend that meeting but were not allowed to vote. Those

teachers who were members of the union ratified the Agreement by a substantial margin. Inj. Tr. 83–88.[1] No member of the union ever filed a claim for unfair representation under the Indiana Code. *See* 4 Ind.Code § 20–7.5–1–7 (1982); 593 F.Supp. at 1226 (apparently mistakenly labeling the appropriate claim as a "grievance.")

Late in April of 1982, 188 white teachers were notified that their contracts were being considered for cancellation. After various proceedings including an all-night hearing on June 1 to 2, 1982, the Board passed a resolution on June 7 affirming the contract cancellations and laying off the 188 teachers. *See* 593 F.Supp. at 1226–27. Pursuant to Article XXIII, Section 9 of the 1980–83 Agreement, no black teachers were laid off. The number of teachers laid off was subsequently reduced to 146 under a consent order in *South Bend Community School Corp. v. National Education Association-South Bend*, No. N–7015 (St. Joseph Cir.Ct., approved Sept. 29, 1982), in which the School Corporation agreed to recall forty-two teachers. 593 F.Supp. at 1227 n. 2. Because of the no minority layoff provision, forty-eight black teachers with certifications similar to, but with less seniority than, forty-eight of the laid off white teachers remained on the job.

On June 11, 1982, two of the laid off white teachers filed a class action suit in the United States District Court for the Northern District of Indiana, alleging that the layoffs discriminated against them on account of their race in violation of the Fourteenth Amendment, 42 U.S.C. §§ 1981 & 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the

Indiana Teacher Tenure Act, IND.CODE § 20–6.1–4–1 *et seq.* (1982). *Britton v. South Bend Community School Corp.*, No. S82–283 (N.D.Ind. filed June 11, 1982). The complaint was amended to delete the class action aspect, and eventually forty-one individual teacher plaintiffs were named instead.[2]

On October 5, 1982, the teachers filed an action in the Indiana courts against the School Corporation and its Board of Trustees (sometimes simply the "Board") for a mandate under section 20–6.1–4–12 of the Indiana Code based on alleged violations of the Indiana Teacher Tenure Act, violations of rights resulting from the manner in which the layoff hearings were conducted and other state claims. *Andrews v. South Bend Community School Corp.*, No. P–1077 (St. Joseph Cir.Ct. filed Oct. 5, 1982). The defendants removed this case to federal court, where it received case number S82–485 and was consolidated with *Britton*.

Plaintiff teachers filed a motion for a preliminary injunction on October 5, 1982, Record Item 14, upon which the court held an evidentiary hearing on November 9 and 10, 1982, and oral argument on December 2, 1982. *Cf.* 593 F.Supp. at 1228. The motion was denied by order on December 15, 1982. The issue of liability was tried to the court in a two-day trial on April 26 and 27, 1984. Both sides submitted post-trial briefs and proposed findings of fact and conclusions of law. Oral argument was heard on August 3, 1984.

On September 25, 1984, the district court entered a memorandum and order. 593

---

**1.** References to the transcript of the evidentiary hearing on the preliminary injunction motion held on November 9 and 10, 1982, will be designated "Inj. Tr." References to the transcript of the bench trial on liability held on April 26 and 27, 1984, will be designated "Tr. Tr."

**2.** All of the plaintiff teachers have duly complied with the administrative filing procedures requisite for bringing a Title VII race discrimination suit and have received right to sue letters. Tr. Tr. 7; Record Item 28. A motion for partial summary judgment against two plaintiff teachers, H. Keller and L. Edler, was filed on

December 2, 1982. That motion was granted on March 10, 1983, and those parties dismissed from the action. 593 F.Supp. at 1228.

Fifteen of the plaintiffs were actually recalled for the 1982–83 school year, but the remaining twenty-six were not. Thirteen of those teachers not immediately recalled apparently had enough seniority to withstand the layoffs but for the no minority layoff provision. The remaining thirteen would need to prevail on their various pendent state claims as well as on the federal claims in order to establish a right to reinstatement or damages. Pl.Br. at 8; App. 41.

F.Supp. at 1223. In its decision the district court found for the defendants on the federal claims, holding the no minority layoff clause to be constitutional and permissible under Title VII. The court declined to exercise its pendent jurisdiction over the plaintiffs' state law claims, and dismissed them without prejudice. The teachers appeal, arguing that the no minority layoff clause (and the layoffs they suffered pursuant to it) violate (1) the Equal Protection Clause of the Fourteenth Amendment, (2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and (3) the Indiana Teacher Tenure Act, IND.CODE § 20–6.1–4–1 *et seq.* (1982).

### B.

The long history of racial segregation and discrimination in Indiana is chronicled in detail in *United States v. Board of School Commissioners of Indianapolis,* 332 F.Supp. 655, 658–77 (S.C.Ind.1971), *aff'd,* 474 F.2d 81 (7th Cir.), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); *see also* Note, *Indianapolis Desegregation: Segregative Intent and the Interdistrict Remedy,* 14 IND.L.REV. 799, 803–04 (1981). Slavery and legally sanctioned discrimination against blacks existed during Indiana's territorial period and during its early history as a state. 332 F.Supp. at 659–61, 663. Even in the pre-Civil War years Indiana's public schools were segregated or simply excluded black children. *Id.* at 663. Ratification of the Fourteenth Amendment had little effect in Indiana's schools; the state passed a statute in 1869 authorizing black children to attend school, but requiring segregated systems. *Id.* at 663–64. Indeed, the stat-utes of Indiana required segregated schools up until 1949. Act of March 8, 1949, ch. 186, 1949 Ind.Acts 603 (present version codified at IND.CODE § 20–8.1–2–1 *et seq.* (1982)).

Our review of the record indicates that the earliest period for which there is information about the percentage of minority teachers is 1963–64. For that period the minority teaching staff in South Bend was only 3.5% of the total teaching staff. Def. Ex. H. In 1968–69 minority teachers accounted for a slightly increased 6.8% of the teaching staff.[3] *Id.* For 1969 and later years, the record includes more expansive evidence of past discrimination by South Bend in the recruitment, hiring and promotion of minority teachers.[4] On March 13, 1975, Kenneth Mines, director for Region V of the Office for Civil Rights of the then Department of Health, Education, and Welfare, sent a letter to the Superintendent of the School Corporation. Def. Ex. M–6. The letter refers to an October 1969 on-site review of the School Corporation's compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The review encompassed complaints by several groups and individual citizens of discriminatory and segregative practices,[5] and other aspects of the School Corporation's compliance. The letter listed five areas in which the Office for Civil Rights found evidence of racial discrimination on the part of the School Corporation. Two of these areas were recruitment of minority teachers and promotions for black and female teachers. The letter also stated that the Office had reviewed recent (January and October 1974) statistical forms completed by the

---

**3.** In 1968–69 minority students comprised sixteen percent of the student body. Def.Ex.H. The corresponding figure for 1963–64 is not in the record.

**4.** The focus of the dissent is on the better documented years around and after 1978. This approach, however, hardly provides an adequate perspective on the relevant history.

**5.** The dissent says that "there need be no correlation between" segregation and discrimination against black teachers. Whatever may be the merit of this proposition as a bit of abstract logic, we think it is unsupportable in the real world. Of course, legally segregated schools in the South before *Brown v. Board of Education* may have created a unique demand for black teachers, but this says little about racial dynamics in South Bend, Indiana. In general, we think the vagaries of numbers and ratios in various real and hypothetical situations are less restrictive than the simple history of black teacher participation (or non-participation) in the South Bend schools.

Superintendent's office. According to the letter, these forms "indicate little improvement with regard to hiring and promotion of minority teachers." Def. Ex. M–6, at 2.

Superintendent Dake responded in a lengthy letter of April 11, 1975. Def. Ex. M–5. Among other things the letter detailed the School Corporation's efforts to recruit minority teachers, which included visits to a number of predominantly black colleges and universities in 1971–72, and more in 1973. The letter listed the number of new minority staff hired for the seven academic years 1968–69 to 1974–75 (totalling 165) and tried to explain the small change in total minority staff by the number of minority staff resignations (109) over the same period.[6] Def. Ex. M–5, at 6–7.

In August 1975 the Regional Office of the OCR sent a letter to many school districts, including South Bend. Def. Ex. M–4. The letter concerned the possible discriminatory impact of layoffs carried out pursuant to seniority rules. The letter stated that seniority rules were not racially unbiased if they perpetuated the effect of past discriminatory personnel practices in recruitment, hiring, promotion and assignment. The letter noted that in the case of school districts that had failed to hire minority teachers until recent years, and so would have a disproportionate number of such persons with low seniority status, the use of a system-wide standard would have a disproportionate—and hence potentially discriminatory—effect on minority group persons. Def. Ex. M–4, at 1–2.

The Office for Civil Rights conducted a second on-site review in 1975, but remained unsatisfied. By letter of October 6, 1975, the Office informed the School Corporation that it had determined that the School Corporation was not in compliance with the provisions of Title VI. Def. Ex. M–3. In particular, the letter remarked on the racially discriminatory teacher assignment practices of the School Corporation, and required the School Corporation to submit within forty-five days a plan that would eliminate any vestiges of past discrimination. Def. Ex. M–3, at 3. After further consultation and correspondence with the School Corporation, the Office for Civil Rights, by letter of March 8, 1976, directed the School Corporation to submit a compliance plan that included an assurance that the Corporation would in the future maintain non-discriminatory recruitment, hiring and assignment practices. Def. Ex. M–2, at 4.

Meanwhile, a number of individuals had filed an action in the United States District Court for the District of Columbia seeking an injunction directing the Department of Health, Education, and Welfare to commence enforcement proceedings against several school districts that had been found by HEW not to be in compliance with Title VI. Among the named school districts was the South Bend Community School Corporation. The District Court found that the School Corporation had been found in violation of Title VI and that neither voluntary compliance had been achieved nor enforcement proceedings had been instituted, and ordered HEW to commence enforcement proceedings. *Brown v. Weinberger*, 417 F.Supp. 1215 (D.D.C.1976).

In 1978 the Board of Trustees considered certain aspects of past discrimination in the school system and ways to eradicate its effects. The discussions began when, at the last meeting during her term as a member of the Board, held on June 19, 1978, Ms. Eugenia Braboy moved that the Board adopt a resolution setting a five-year goal within which to adopt and implement programs to reduce the racial imbalance in the school system (and especially that associated with racially identifiable schools). The

---

**6.** The letter did not compare the resignation rate of black teachers to that of white teachers or otherwise attempt to explain the number of resignations of black teachers. There was testimony at one of the Board's 1978 meetings that the turnover of black teachers over the period was comparable to that of white teachers. Def.Ex. K–3, at 1.

proposed resolution passed unanimously. Def. Ex. K–1.

Discussions were held at several subsequent Board meetings focusing on prior discrimination manifested in the extremely low percentages of minorities on the School Corporation's teaching staff. Tr. Tr. 90–91; Def. Exs. K–1 to K–5 (minutes of school board meetings); 593 F.Supp. at 1225. Past discrimination in the recruitment, hiring and assignment of minority teachers was said to be reflected in and to be the cause of the gross disparity between the percentage of black teachers employed by the School Corporation and the percentage of blacks in either the student body or local community. Def. Exs. E–1, E–2. The percentage of blacks in the student body and in the community approximated 22% in late 1978 while the percentage of black teachers was only 10.4%.

The statistical evidence presented was not merely of a present disparity between the percentages of minority teachers and minority students. Rather it ranged over a period of at least eight years. See, e.g., Def. Ex. K–3; at 2; see also Def. Exs. E–1, E–2.

Although no statistics were presented to the effect that the School Corporation had been hiring a disproportionately small number of black teachers,[7] there was testimony that there was no shortage of qualified black applicants for teaching positions. Def. Ex. K–2. There was testimonial evidence that implied that five particular qualified black applicants had not been hired because of their race. Def. Ex. K–2, at 2. Testimonial evidence also established that the School Corporation had a practice of posting full-time vacancies so they could be filled by hiring substitute teachers already employed by the School Corporation, and that principals' requests that a particular substitute be hired for a vacancy were often honored. Only if no candidate could be found within the School Corporation would the position be advertised and recruiting from the outside take place. Def. Ex. K–3.

As a result of the discussions at the meetings held during the fall, on December 18, 1978, the Board adopted Resolution 1020. App. 31–34.[8] Resolution 1020 states that "[p]roviding the community with quality education should be the top priority in the schools," App. 31, and sets out the School Corporation's policies and employment goals. Two of the goals adopted in Resolution 1020 were (1) that the School Corporation would strive to increase the percentage of minorities in its teaching force until that percentage "approximately correspond[ed]" to the percentage of minorities in its student body, and (2) that the School Corporation would "endeavor to exceed each year the previous year's employment figures for minority personnel ... until the minimum desired percentages [were] reached." App. 34. In the three years following the adoption of Resolution 1020 the School Corporation hired a greater percentage of black teachers than it had in any comparable prior period. As a result, the percentage of black teachers rose from 10.4% for the 1978–79 academic year to 13.0% for the 1981–82 academic year. During the latter year black pupils made up 25.42% of the student population. 593 F.Supp. at 1225.

The Department of Justice filed suit against the School Corporation on February 8, 1980. *United States v. South Bend Community School Corp.*, No. S80–35

---

**7.** At oral argument counsel for the plaintiff teachers stated that records on the race of applicants is only available for one year. Def.Ex. K–3, at 6. Counsel for the School Corporation stated that figures on the national or state pool of qualified black teaching applicants were probably not available. This is apparently one of the reasons Resolution 1020 as adopted set the goals in terms of the percentage of minority students in the school district; the School Corporation had those figures readily available. Def.Ex. K–5, at 10.

**8.** An additional reason given for the adoption of Resolution 1020 was that students, both black and white, needed a sufficient number of minority teachers to act as role models. *See* Inj.Tr. 103; Def.Ex.H, at 2; App. 31. We, of course, do not rest our decision on any particular theory of role modeling and the dissent's emphasis on this subject is misplaced.

(N.D.Ind. filed Feb. 8, 1980).[9] Its complaint alleged that the School Corporation had engaged in acts of racial discrimination intended to have and having the effect of segregating students and teachers on the basis of race. Among these acts were the hiring, promotion and assignment of faculty on the basis of race. Appended to the complaint was a certificate by the Attorney General (as required by 42 U.S.C. § 2000c–6(a)) stating that he had received complaints of racial discrimination and school segregation and had investigated the complaints and determined that they were meritorious.

The case was settled by a consent order the same day it was commenced. Def. Ex. C–1, App. 35. As in most consent decrees, the defendant School Board denied that it had engaged in intentional acts of racial discrimination.[10] The consent order required the School Corporation to develop a specific desegregation plan for student assignments by September 1, 1980. The consent order also required the School Corporation to rectify the effect of past discrimination against teachers, and provided:

6. By the beginning of the 1980–81 school year, the faculties of each school operated by the School Corporation shall be appropriately adjusted so that each approximately reflects the average racial composition, teaching experience, and teaching disciplines of the faculty of the school system as a whole. Educational and extracurricular programs shall be equal for each school serving similar grade levels and similar student needs.

. . . .

8. The Board of School Trustees shall continue to pursue its present affirmative action hiring policies.

Consent Order at 3, App. 37. The Board's affirmative action policy was set out in Resolution 1020. Thus, the consent order, by mandating continuation of that policy, required the Board to continue to increase the percentage of minorities on its teaching staff until that percentage equalled or roughly approximated the percentage of minority pupils in the student body, and to endeavor to exceed each year the previous year's employment figures for minority personnel. And it was in furtherance of that policy, in light of expected school enrollment and budgetary constraints, that the no minority layoff clause was proposed by the School Corporation, agreed to by the teachers' negotiators and strongly ratified by the union teachers.[11]

## II.

The Supreme Court has consistently held that a governmental body may use race-conscious plans to eradicate the effects of past discrimination. *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65

---

**9.** The district judge below took judicial notice of the record in the desegregation case, over which he had presided. Inj.Tr. 100.

**10.** The present Assistant Attorney General for Civil Rights makes much of this denial in a misleading footnote to his *amicus* brief. U.S.Br. at 5 n. 4. The government neglects the fact that almost all consent decrees take the form "We didn't do it. We agree not to do it again." The reasons for this, at least in the discrimination context, are compellingly set out by Justice Blackmun in his opinion in *United Steelworkers v. Weber*, 443 U.S. 193, 209–11, 99 S.Ct. 2721, 2730–31, 61 L.Ed.2d 480 (1979) (Blackmun, J. concurring). Further, the government ignores the fact that it alleged that there had been such discrimination, and must have had what it considered to be stong evidence of this because the Attorney General certified that the complaints of discrimination were meritorious and the department brought suit.

**11.** There is no evidence at all that the teachers did not know what they were doing or could not make their views felt—as the dissent suggests. There is no reason to believe that the teachers did not or were not able to press their views about key provisions on the leadership. It is much more likely that the white teachers recognized the educational importance of adequate minority representation on the teaching staff and were willing to go to the unusual lengths of putting their own interests at risk in support of that principle.

We are not insensitive to the painful impact of the seniority provisions on a number of white teachers. But the teachers were not oblivious of these possibilities when they voted for the provision. Apparently they recognized that to set right longstanding injustice some sacrifice by the majority was inescapable.

L.Ed.2d 902 (1980); *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *North Carolina Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971). In *Bakke* and *Fullilove* the court held that affirmative action plans voluntarily adopted by governmental bodies are not *per se* unconstitutional. *Fullilove,* 448 U.S. at 482, 100 S.Ct. at 2776; *Bakke,* 438 U.S. at 287, 98 S.Ct. at 2746; *see Janowiak v. Corporate City of South Bend,* 750 F.2d 557, 561 (7th Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 3896 (U.S. June 10, 1985) (No. 84–1936). Similarly, the Court has held that employers may adopt affirmative action plans to remedy past discrimination. *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Janowiak,* 750 F.2d at 561. Thus, race-conscious programs do not, as a matter of law, violate either Title VII or the Equal Protection Clause of the Fourteenth Amendment. *Janowiak,* 750 F.2d at 561. The inquiry before this court, therefore, is whether this particular affirmative action plan is valid under the constitution and Title VII. We will begin with an analysis of the plan provision under Title VII.

### III.

In *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court provided guidelines for analyzing the validity of an affirmative action plan under Title VII. The Court declined in *Weber* to promulgate a general test to distinguish between permissible and impermissible affirmative action plans. *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729. However, the Court did find that the plan before it lay on the permissible side of the line. *Id.* The plan had been entered into by the employer and the union in order to "eliminate conspicuous racial imbalances in Kaiser's then almost exclusively white craftwork forces," 443 U.S. at 198, 99 S.,Ct. at 2724, by reserving for blacks half the openings in newly-created in-plant training programs. Prior to initiation of the in-plant training programs, Kaiser had only hired as craft-workers for its plants persons with prior craft experience (who were almost all white because craft unions had long excluded blacks). *Id.* The Court took judicial notice of the fact that craft unions excluded blacks. 443 U.S. at 198 n. 1, 99 S.Ct. at 2725 n. 1 ("Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice."). Thus, the purpose of the plan mirrored those of the statute, for it was "designed to break down old patterns of racial segregation and hierarchy." 443 U.S. at 208, 99 S.Ct. at 2729. Second, the plan did not "unnecessarily trammel the interests of the white employees." *Id.* The Court concluded, therefore, that the plan fell "within the area of discretion left by Title VII to the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." 443 U.S. at 209, 99 S.Ct. at 2730 (footnote omitted).

On its facts *Weber* dealt with whether and to what extent a private employer could adopt an affirmative action plan consistent with Title VII. Title VII applies as well to public employers, including states and their official agencies. *See* 42 U.S.C. § 2000e(a), (b), (h) (codifying amendments made by § 2(1), (2), (6) of the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103). The analysis from *Weber* has been applied to governmental employers, so that an affirmative action plan that satisfies the *Weber* criteria will insulate the employer from Title VII liability for particular employment decisions pursuant to it. *Janowiak,* 750 F.2d at 562–63; *Bushey v. New York State Civil Service Commission,* 733 F.2d 220, 227 n. 8 (2d Cir.1984) ("We reject Plaintiffs'

contention that *Weber* ... is inapplicable because the employer in *Weber* was a private entity whereas here it is a public entity."), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 S.Ct. 795 (1985); *Bratton v. City of Detroit,* 704 F.2d 878, 884 (6th Cir.), *modified in other respects,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *La Riviere v. EEOC,* 682 F.2d 1275, 1279 (9th Cir.1982) (collecting cases); *see Deveraux v. Geary,* 765 F.2d 268, 274 n. 5 (1st Cir. 1985) (collecting additional cases); *see also United States v. City of Chicago,* 573 F.2d 416, 423 (7th Cir.1978) (Title VII standards do not vary depending on whether defendant is a public or private employer).

### A.

Based on the *Weber* Court's reliance on the employer's determination of a "conspicuous racial imbalance" in what it took judicial notice to be a "traditionally segregated job category," this court has interpreted *Weber* as requiring that governmental affirmative action plans "be based upon findings of past discrimination by a competent body." *Janowiak,* 750 F.2d at 561; *cf. Lehman v. Yellow Freight System, Inc.,* 651 F.2d 520, 527 n. 14 (7th Cir.1981) (refusing to decide whether objectives other than remedying past discrimination would support private affirmative action plans). In *Janowiak,* we determined that on a summary judgment motion it was improper to conclude that as a matter of law an affirmative action plan survived a Title VII challenge when the plan was adopted solely on the grounds of a present statistical dispari-

ty between employees and the relevant labor pool and in spite of the fact that two review boards had found the hiring practices reasonable. *Janowiak,* 750 F.2d at 562–63.

■ The first step in a *Weber* analysis under *Janowiak* is to determine whether there has been a finding of past discrimination "by a competent body." In *Janowiak* we held that the South Bend Board of Public Safety was a body competent both to make findings of past discrimination and to implement an affirmative action plan "because the Board is the 'administrative body legally responsible for the operation of the South Bend Fire Department.'" *Janowiak,* 750 F.2d at 561 (quoting IND.CODE ANN. § 36–8–3–2 (West 1983)).[12] Here, of course, the Board of Trustees is the body legally responsible for operating the South Bend school district. Therefore it is competent both to make findings of past discrimination and to implement an affirmative action plan. But the Board is not the only body involved here—the Office for Civil Rights of HEW, the United States Department of Justice, and the United States District Courts for the District of Columbia and the Northern District of Indiana have been involved. The plaintiffs do not, as they could not, argue that courts or the Office of Civil Rights or the Department of Justice are not bodies competent to make the required findings.

■ Rather, they argue that any findings that were made by these bodies are not adequate. We disagree. None of the findings here were based solely on evidence

---

**12.** Obviously this rationale would not apply to a private employer for whom there is no administrative body legally responsible for its operation. Presumably the employer is itself competent to make a finding of past discrimination, for instance, by determining that the job category is "traditionally segregated."

In holding that the South Bend Board of Public Safety was competent to make findings of past discrimination, we were following the Brennan plurality in *Bakke* rather than Justice Powell's *Bakke* opinion. One of the issues in *Bakke* was whether the Board of Regents of the University of California was competent to make findings of past discrimination. The Board was

the "administrative body legally responsible for the operation" of the University of California at Davis Medical School. Justice Powell determined that the Board was not competent to make the findings. *Bakke,* 438 U.S. at 309–10, 98 S.Ct. at 2757-58 (Powell, J. opinion). The Brennan plurality determined that the Board was competent. *Bakke,* 438 U.S. at 366 n. 42, 98 S.Ct. at 2787 n. 42 (Brennan, White, Marshall and Blackmun, JJ. opinion). The School Board here is analogous to the Board of Trustees in *Bakke.* Therefore, under the approach of the Brennan plurality followed in *Janowiak,* it is a body competent to make findings of past discrimination.

of a present "statistical disparity between the percentage of minorities employed and the percentage of minorities within the community." *Janowiak*, 750 F.2d at 562. Nor, of course, did the district court here approve the no minority layoff provision as a matter of law on summary judgment.

The no minority layoff provision was adopted by the Board and the teachers as a way to further Resolution 1020 in the face of possible layoffs necessitated by enrollment decline and budget constraints. Resolution 1020 was adopted by the Board after a series of meetings at which it considered the problem of the vestiges of past discrimination in the school system. It is true that the Board received statistics concerning the percentages of minority teachers and pupils in the school system. The statistics were not, however, merely for the current year, but covered a number of years. Further, the Board heard nonstatistical evidence. There was testimony that there was not a shortage of black applicants for teaching positions. Def. Ex. K–2. There was also testimony that there were "at least five people who have met the qualifications to become a teacher and have applied for positions and have not been hired, all blacks." Def. Ex. K–2, at 2. Further, there was testimony indicating that vacancies were first posted so that substitute teachers could apply for them before the vacancies were advertised outside the school system, and that principals often requested that substitutes be appointed to vacancies. Def. Ex. K–3. Obviously, this hiring practice would tend to perpetuate the effects of any past discrimination in hiring substitute teachers. We believe that this evidentiary basis meets every test of legal sufficiency and is a broad foundation on which the School Board was authorized and in fact required to adopt Resolution 1020. *See Janowiak*, 750 F.2d at 564.

The difference between the evidence in this case and in *Janowiak* is highlighted by a fact crucial to our decision in *Janowiak*. In that case a Minority Recruitment Task Force and a Minority Recruitment Review Committee, both of which had been consti-

tuted by the South Bend Board of Public Safety to study the hiring procedures for the city's fire department, reviewed the department's application and hiring procedures. Both the Task Force and the Review Committee found that the application and testing procedures were reasonable and not discriminatory and recommended that they be retained. 750 F.2d at 558–59. Here, however, no task force, review committee or other body ever studied the School Corporation's past recruitment and hiring practices and determined that these were reasonable.

Indeed, the direct opposite is the case. The Office for Civil Rights of HEW studied those policies and other aspects of the operation of the school system, and concluded that the School Corporation discriminated against minority teachers on the basis of race. This conclusion was, of course, based on more than a showing of present statistical disparity between the percentages of minority teachers and pupils. The OCR conducted two on-site investigations of the School Corporation and reviewed complaints from individuals and organizations.

This administrative finding of past discrimination in the recruiting and hiring of minority teachers was confirmed in *Brown v. Weinberger*, 417 F.Supp. 1215 (D.D.C. 1976). In *Brown*, the district court also found that the School Corporation had not brought itself into compliance with Title VI.

It was in response to the HEW and district court findings, as well as in a response to the concerns of citizens, that the Board began its consideration of minority hiring practices that lead to the adoption of Resolution 1020. Further, two years later the Attorney General certified that he had investigated complaints of race discrimination and school segregation and believed that the complaints were meritorious. This investigation was the basis of the Department of Justice suit that was settled by the consent decree requiring the School Corporation to continue its affirmative action hir-

ing policies embodied in Resolution 1020. *United States v. South Bend Community School Corp.*, No. S80–35 (N.D.Ind. Feb. 8, 1980).

We believe that the findings of past discrimination here are clearly sufficient to support the School Corporation's affirmative action policy, including both Resolution 1020 and the no minority layoff clause, in the face of a Title VII challenge. *See Kromnick v. School District of Philadelphia*, 739 F.2d 894, 904–06 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *Valentine v. Smith*, 654 F.2d 503, 507–10 (8th Cir.) (equal protection), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *see also* Part IV A, *infra.* Further, if we felt it were necessary (which it is not because the findings of past discrimination satisfy the *Janowiak* requirements) we would not hesitate to follow the Supreme Court's lead and take judicial notice of the fact that teaching is a "traditionally segregated job category." [13] A study of racial practices in Indiana schools—segregated by law until 1949—certainly affords no basis for doubt

that black teachers suffered discrimination in South Bend. A contrary conclusion would defy common sense.

**B.**

■ The second prong of the *Weber* test requires that an affirmative action plan not "unnecessarily trammel the interests of the white employees." 443 U.S. at 208, 99 S.Ct. at 2729. In *Weber* the court considered several factors in determining that the Kaiser plan was acceptable. The plan did not require the discharge of white workers and their replacement by new black hires nor did it create an absolute bar to the advancement of white employees. The plan was temporary and would end as soon as the percentage of black skilled craftworkers approximated the percentage of blacks in the local labor force. And the plan was not designed to maintain a racial balance but to eliminate a manifest racial imbalance. 443 U.S. at 208–09, 99 S.Ct. at 2729–30. We believe that a similar analysis shows that the no layoff provision of the 1980–83 Agreement does not unneces-

**13.** With respect to teaching, we mean by this that black teachers traditionally taught in all black schools, primarily in states in which schools were legally segregated by race. But, as noted *supra*, the earliest available statistics in the record indicate that in 1963–64 the minority teaching staff in the South Bend schools amounted to only 3.5% of the total teaching staff. Def.Ex.H.

Judicial findings of racial discrimination by public school systems are legion. *E.g., Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Columbus Board of Education v. Renick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *North Carolina Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

The appendices in *Brown v. Weinberger*, 417 F.Supp. 1215, 1223–24 (D.D.C.1976) list six school districts found ineligible by HEW for funding under an Emergency School Aid Act (Pub.L. No. 92–318, Title VII, 86 Stat. 354 (1972), codified at 20 U.S.C. § 1601 *et seq.*, repealed by Pub.L. No. 95–561, § 601(b)(2), 92 Stat. 2268 (1978)), 26 school districts (including

South Bend) found by HEW to be in violation of Title VI, and 14 school districts under investigation for possible violations of Title VI. The appendices in *Adams v. Richardson*, 356 F.Supp. 92, 100–02 (D.D.C.), *aff'd as modified*, 480 F.2d 1159 (D.C.Cir.1973) (en banc) (per curiam), a case similar to *Brown*, list ten states whose higher education programs were found by HEW to violate Title VI, 85 school districts with one or more schools of substantially disproportionate racial composition, contrary to Title VI, and 42 school districts found by HEW to be in presumptive violation of the Supreme Court's decision in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In *Weber*, of course, the Supreme Court's judicial notice that crafts were traditionally segregated job categories took the place of a finding of past discrimination by the employer. (The Fifth Circuit had held that the plan was invalid because there had been no finding of past discrimination by Kaiser. *Weber v. Kaiser Aluminum & Chemical Corp.*, 563 F.2d 216, 224–26 (5th Cir.1977), *rev'd*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).) *Janowiak* does not purport to require a finding of past discrimination for an affirmative action plan in a traditionally segregated job category to survive a Title VII challenge.

sarily trammel the interests of the white teachers.[14]

First and most clearly, the provision is temporary. It is a term in the 1980–83 Agreement. Unless the union again agreed to the provision, it would expire when the Agreement terminated on August 15, 1983. As things worked out, the provision was both readopted and then altered in the 1983–84 collective bargaining agreement between the School Corporation and NEA-South Bend. The 1983–84 Agreement included the provision in identical language. Pl. Ex. 14, Art. XXIII, § 9. However, a Memorandum of Understanding appended to the 1983–84 Agreement set up a joint teacher-administrator committee to study the language of the no minority layoff clause and make recommendations for the 1984–85 contract negotiations. Pl. Ex. 14, at 61. The Memorandum further provided that if no agreement on a recommendation could be reached, the first thirty-five layoffs for the 1984–85 school year would be governed by the language of the no minority layoff provision. If further layoffs were necessary, they would be governed by the following language:

> The percentage of minority bargaining unit employees employed during a year in which staff reductions are implemented shall reflect the same percentage of minority bargaining unit employees em-

ployed during the preceding year. This percentage shall be determined by dividing the number of minority bargaining unit employees by the total number of bargaining unit employees in the Corporation. The computation shall be mutually determined by the Association and the Corporation on or before February 1 of each year.

*Id.* In January 1984 the committee recommended the adoption of the following substitute clause:

> Affirmative action is defined as maintaining the same percentage of minority teachers in each minority classification throughout a period of reduction in force as were employed prior to such a reduction. For the purposes of this contract, minority shall be defined as members of the Black and Hispanic Races.

593 F.Supp. at 1227–28 (quoting "Final Report of the Minority Language Committee" (Pl. Ex. 12) p. 17 § 5; App. 45).

In these circumstances the District Court was correct to reject the plaintiffs' characterization of the provision as an ongoing racial-balance-maintenance measure. 593 F.Supp. at 1232. The provision was necessarily temporary because it was incorporated in a collective bargaining agreement of limited duration. *See Kromnick v. School District of Philadelphia,* 739 F.2d 894,

---

**14.** Some courts appear to have treated some of these factors as independent prongs of the *Weber* test. *See, e.g., Johnson v. Transportation Agency, Santa Clara County, California,* 748 F.2d 1308, 1311 (9th Cir.1984). We doubt this is the correct approach. First, the text of *Weber,* in paragraph and sentence structure and in wording, leads us to believe there are only two prongs to the test. *See* W. Boyd, *Affirmative Action in Employment—The Weber Decision,* 66 IOWA L.REV. 1, 21 (1980) (explaining *Weber* test as two-pronged); *see also Bushey v. New York State Civil Service Commission,* 733 F.2d 220, 228 (2d Cir.1984) (implying two prongs to *Weber* test), *cert. denied,* — U.S. —, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985); *cf. Kromnick v. School District of Philadelphia,* 739 F.2d 894, 911 (3d Cir.1984) (implying temporal limitation factor is third prong), *cert. denied,* — U.S. —, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *Lehman v. Yellow Freight System, Inc.,* 651 F.2d 520, 526 (7th Cir.1981) (same) (dictum). Second, logic indicates that if some of these factors are ful-

filled others will be, and so they would seem to be redundant as separate prongs. For instance, if a plan's purpose mirrored that of Title VII, which certainly does not include the maintenance of a particular racial balance in a workforce, then a plan could not be a permanent measure intended to maintain racial balance. Further, if all these factors were spelled out as independent prongs, there would be nothing left except its own intuitions by which a court could determine whether the "not unnecessarily trammeled" prong was satisfied. That prong would become either vacuous or unprincipled and politicized. Of course, we do weigh each of these factors in our determination whether the plan unnecessarily trammels the interests of the white employees, and so there may well not be any necessary difference in result under the approach that balances these factors under the single "unnecessary trammels" prong and an approach that treats some of them as independent prongs.

911–12 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). Further, the changes proposed by the Minority Language Committee, indeed the constitution of the committee itself, is strong evidence that the provision was always meant to be temporary.

Nor did the provision require the discharge of white teachers and their replacement by new black hires, or create an absolute bar to the advancement of the white teachers. It did require that some white teachers be laid off who would not otherwise have been laid off. The forty-eight white teachers who would not have been laid off but for the provision made up 3.33% of the School Corporation's (before layoff) teaching staff of 1443 (and 3.77% of the after-layoff staff of 1274). Those who were laid off were at the head of the queue for rehire. And as the plaintiffs admit, all but twenty of the teachers originally laid off had been recalled by August 1984. 593 F.Supp. at 1231–32.[15] The provision did not affect the hiring or promotion of whites, or of any teachers.

Furthermore, the district court found that testimony at trial established that the provision was designed to do nothing more than prevent the loss of the hiring gains that had been achieved since the Board had resolved to increase the percentage of its black teachers. 593 F.Supp. at 1232. This finding is not clearly erroneous. As the district court noted, in a period of "declining staff and student enrollment, layoff provisions are the only means of retaining any progress made in hiring procedures." 593 F.Supp. at 1232.

The plaintiffs argue that two alternative methods could have preserved this gain and show that the provision unnecessarily trammel their rights. They claim that layoffs could have been effected pursuant to the rest of the seniority system, with black teachers recalled first, or that layoffs could have been made proportionally, as under the new contract and in the form approved in *Wygant v. Jackson Board of Education,* 746 F.2d 1152 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985).[16] Layoffs pursuant to the rest of the seniority system would have reduced the percentage of black teachers from 13.0% to 10.8%, barely higher than the percentage of black teachers on the staff at the time Resolution 1020 was adopted (10.4%). 593 F.Supp. at 1232. Layoffs under a proportionate system would have kept the percentage of black teachers at 13.0%. But Resolution 1020 also stated that it was a goal of the School Corporation to increase the percentage of minority employees every year, and *Wygant* does not hold that greater than proportionate layoffs are impermissible. In light of these factors we cannot say the no minority layoff provision trammeled, much less unnecessarily trammeled, the interests of the white teachers merely because layoffs pursuant to it raised the percentages of black teachers on the staff from 13.0% to 13.8%.

We conclude that the no minority layoff provision does not unnecessarily trammel the interests of the white teachers. And because the provision satisfies both prongs of the *Weber* test, it does not violate Title VII.

### C.

The plaintiffs argue that *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S.

---

**15.** At oral argument plaintiffs' counsel stated that all but five of the teachers had been recalled.

**16.** The Supreme Court granted certiorari in *Wygant* to consider whether the Constitution allows racial preferences for teacher layoffs adopted by a public employer, in the absence of findings of past discrimination, that are based solely upon the disparity between respective percentages of minority faculty members and students. *See,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (subject matter summary of case recently docketed); *Deveraux v. Geary,* 765 F.2d 268, 275 n. 6 (1st Cir.1985). Here, as we discuss in parts III A and IV A, there are adequate findings of past discrimination, and neither those findings nor the layoff provision was based solely on a disparity in the respective percentages of minority faculty members and students. Thus the Supreme Court's grant of certiorari in *Wygant* should not affect our reliance on the Sixth Circuit's decision or our result in this case.

561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), shows that the no minority layoff provision violates Title VII. In *Stotts*, the Supreme Court held that Title VII, and in particular sections 703(h) and 706(g), 42 U.S.C. §§ 2000e–2(h) & 2000e–5(g), barred a district court from modifying a consent decree over one party's objection and ordering that layoffs be made so as to retain black hires who had been the beneficiaries of that prior remedial consent decree. The prior decree did not itself limit or modify preexisting bona fide seniority rights. *See Deveraux v. Geary,* 765 F.2d 268, 272 (1st Cir.1985); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 486–87 (6th Cir.1985); *Kromnick v. School District of Philadelphia,* 739 F.2d at 911; *Grann v. City of Madison,* 738 F.2d 786, 795 n. 5 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984); *see also* 593 F.Supp. at 1230.

■ *Stotts* is distinguishable on several grounds. First, section 703(h), on which the Court relied and which protects bona fide seniority systems that are not the result of an intent to discriminate, is not applicable here. The union and the School Corporation "incorporated the [no minority layoff provision] . . . in their collective bargaining contract, thereby agreeing that certain prerequisites of seniority are to be qualified by that policy." *Kromnick v. School District of Philadelphia,* 739 F.2d at 911. Unlike *Stotts,* there is no override of a bona fide seniority plan. *Deveraux v. Geary,* 765 F.2d at 273; *EEOC v. Local 638,* 753 F.2d 1172, 1186 (2d Cir.1985); *Wygant v. Jackson Board of Education,* 746 F.2d at 1157–59; *Kromnick v. School District of Philadelphia,* 739 F.2d at 911. Second, *Stotts* concerned a *court-imposed* affirmative action plan. Indeed, the no minority layoff plan there was imposed over

the objections of the city. The Court explicitly refused to decide whether the city would have been unable to voluntarily adopt such a provision. *Stotts,* 467 U.S. at —, 104 S.Ct. at 2590; *Turner v. Orr,* 759 F.2d 817, 824–25 (11th Cir.1985); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 486 (6th Cir.1985); *Wygant v. Jackson Board of Education,* 746 F.2d at 1158. Third, *Stotts* did not even purport to, much less actually, overrule *Weber. Deveraux v. Geary,* 765 F.2d at 274; *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d at 487–88 & n. 7; *Wygant v. Jackson Board of Education,* 746 F.2d at 1158. All the circuits that have considered the issue have concluded that *Weber* remains good law. *Deveraux v. Geary,* 765 F.2d at 274–75 (First Circuit decision collecting cases from Second, Third, Sixth, Seventh and Ninth Circuits); *see also Turner v. Orr,* 759 F.2d at 825 (Eleventh Circuit). Finally, we note that in essence *Stotts* was a case about a district court's power to amend a consent decree over the objections of one of the parties. *Stotts,* — U.S. at —, 105 S.Ct. at 2594–95 (Stevens, J. concurring in the judgment); *see Deveraux v. Geary,* 765 F.2d at 272–73; *Grann v. City of Madison,* 738 F.2d 795 n. 5. Therefore, we agree with the district court that *Stotts* does not decide this case. 593 F.Supp. at 1230–31 & n. 4. Indeed, the plaintiffs finally concede as much. Pl. Br. at 17.[17]

We conclude that the no minority layoff provision of the 1980–83 Agreement does not violate Title VII.

## IV.

Because the no minority layoff provision does not violate Title VII, we must consider the plaintiffs' claim that it violates the

---

17. An argument could be made that if *Stotts* decides this case it compels *affirmance* rather than reversal. Stotts does not overrule *Weber,* and we have determined that the provision in question here satisfies the *Weber* test and so does not violate Title VII. The provision was incorporated in the collective bargaining agreement and became effectively part of the seniority plan of the School Corporation's teachers.

Because it is permissible under Title VII it is presumably protected by section 703(h). If the district court here had ordered the white teachers reinstated it would have done so over the School Corporation's objections, and been in a position analogous to that of the district court in *Stotts,* whose action the Supreme Court held to be prohibited by Section 706(g).

Equal Protection Clause. The Supreme Court has considered the merits of constitutional challenges to affirmative action plans in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In neither case did any opinion command the assent of a majority of the Court. Thus the Court's opinions do not provide the kind of guidance in the constitutional area that its decision in *Weber* does in analyzing Title VII challenges. Indeed, this court has recently stated:

> After reviewing the eleven separate opinions filed in these two plurality decisions, this court agrees with the Sixth Circuit that "the only clear consensus to be garnered from these various statements is that in any affirmative action program (1) some governmental interest must be served, and (2) the program must somehow be directed toward the achievement of that objective."

*Janowiak*, 750 F.2d at 563 (quoting *Bratton v. City of Detroit*, 704 F.2d 878, 885 (6th Cir.), *modified in other respects*, 712 F.2d 222 (6th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *see Valentine v. Smith*, 654 F.2d 503, 509 nn. 11 & 12 (8th Cir.) (detailing the various positions of the Justices on necessary finding of past discrimination and appropriate standard of review), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *United States v. City of Miami*, 614 F.2d 1322, 1337 (5th Cir. 1980) ("In over one hundred and fifty pages of United States Reports [that make up the *Bakke* opinions], the Justices have told us mainly that they have agreed to disagree."), *rehearing en banc*, 664 F.2d 435 (5th Cir.1981). *But see infra* at 811–12 & n. 19.

## A.

■ We first examine whether the no minority layoff clause serves a governmental interest. There is some uncertainty as to whether the governmental interest in remedying the effects of past societal dis-

crimination is a compelling interest. *See Valentine v. Smith*, 654 F.2d at 508 n. 5 (identifying positions of Justices in *Fullilove* and *Bakke* opinions). There is not, however, any doubt that this interest is substantial and important enough to support affirmative action plans. *Fullilove*, 448 U.S. at 453, 100 S.Ct. at 2762 (Burger, C.J., opinion, joined by Powell and White, JJ.); *id.* at 519–20, 100 S.Ct. at 2795–96 (Marshall, J., concurring in the judgment, joined by Brennan and Blackmun, JJ.,); *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757 (Powell, J. opinion); *id.* at 362, 98 S.Ct. at 2784 (Brennan, Marshall, Blackmun and White, JJ. opinion); *Janowiak*, 750 F.2d at 563. In order to show that the affirmative action plan serves the substantial and important interest of remedying the effects of discrimination, there must be a finding of past discrimination. *Janowiak*, 750 F.2d at 563–64; *Valentine v. Smith*, 654 F.2d at 508. Once again, the issue before us is whether the findings of past discrimination are sufficient.

In *Janowiak*, we held that the "failure to put forward any evidence other than evidence of statistical disparity and [defendants'] own admissions that the hiring practices appeared reasonable and non-discriminatory," 750 F.2d at 564, was insufficient to constitute a finding of discrimination to support summary judgment for defendants as a matter of law on a constitutional challenge to their affirmative action plan. But the evidence here was not a mere present statistical disparity coupled with a finding that the hiring procedures were reasonable and non-discriminatory. *See supra* part III A. And, as previously noted, the district court found for defendants not on summary judgment but after an evidentiary hearing and a trial. We believe the findings were fully adequate.

■ Our conclusion that the findings here are sufficient to enable the no minority layoff provision to withstand an Equal Protection challenge is supported by *Kromnick v. School District of Philadelphia*, 739 F.2d 894 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 782, 83

L.Ed.2d 777 (1985), and *Valentine v. Smith*, 654 F.2d 503 (8th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

*Valentine* is on all fours with this case. The plaintiff, Bonnie Valentine, alleged that the Arkansas State University had, in violation of the Equal Protection Clause of the Fourteenth Amendment, refused to hire her because she was white.[18] The Eighth Circuit acknowledged that Valentine had been rejected because of her race, but affirmed a judgment for the university because ASU hired the black applicant pursuant to its affirmative action plan. *Valentine*, 654 F.2d at 507–11. The court required ASU to predicate its affirmative action plan on a finding of past discrimination. 654 F.2d at 508. (We relied on *Valentine* for this requirement in *Janowiak*, 750 F.2d at 564.) The Office of Civil Rights of HEW had conducted a compliance review of ASU under Title VI in 1968. In January 1969 HEW informed the governor of Arkansas that the state's universitites, including ASU, were not in compliance with Title VI. Voluntary compliance was not achieved, and in February 1973 the District Court for the District of Columbia ordered HEW to commence enforcement proceedings against ASU so as to bring the university into compliance with Title VI. *Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.), *aff'd as modified*, 480 F.2d 1159 (D.C.Cir.1973) (en banc) (per curiam). ASU finally submitted a plan late in 1975 in response to the findings and the action taken by the OCR. 654 F.2d at 505–06, 508–09. The Eighth Circuit held that these findings were adequate:

> There is no consensus on what findings of past discrimination justify remedial affirmative action. Nevertheless, the issue of whether the findings of past discrimination made by the District of Columbia District Court and HEW were adequate to justify a race-conscious remedy is not even close. Findings of previous statutory violations of title VI by a district court and OCR justify the use of some type of race-conscious remedy by a state to serve its constitutionally permissible objective of remedying past discrimination.

*Valentine*, 654 F.2d at 509 (footnote omitted).

*Kromnick v. School District of Philadelphia* arose from a Title VI (and hence constitutional-standard-invoking) challenge to a policy that sought to maintain a faculty ratio at the relevant schools of between 75% and 125% of the system-wide proportion of black and white teachers. From 1978 to 1982 the Office for Civil Rights of HEW required the school district to maintain this policy in order to be eligible for federal funds under an Emergency School Aid Act (Pub.L. No. 89–10, Title VI, 79 Stat. 55 (1965), Pub.L. No. 95–561, Title VI, 92 Stat. 2252 (1978), codified at 20 U.S.C. § 3191–3207, repealed by Pub.L. No. 97–35, § 587(a), 95 Stat. 480 (1981) effective Oct. 1, 1982). In 1982 the OCR for the Department of Education, which had assumed compliance responsibility, found the district in compliance with its regulations and no longer required the proportionality policy. The school district continued the policy voluntarily. 739 F.2d at 897–900.

The district court held that there was inadequate evidence that the 75%–125% policy continued to serve a remedial purpose. The Third Circuit reversed:

> The district court apparently believed that once the School District was relieved by the OCR in 1982 of the obligation to maintain the 75%–125% policy, its action in continuing that policy ceased to be remedial. The district court ignored the 15 year history of state proceedings

---

**18.** Valentine, a white, had taught at ASU from 1967 until 1974, when she resigned for personal reasons. Her replacement, the only black on the business faculty, resigned in 1976 and Valentine applied for her former position. She was rated the most qualified candidate by the faculty search committee and the dean of the college of business administration. The affirmative action officer at ASU removed the names of all white candidates from the list, including Valentine's, and one of the two black applicants recommended by the affirmative action officer was hired by ASU. *Valentine*, 654 F.2d at 506–07.

against the School District, which are still pending in state court, directed to effecting integration of the Philadelphia public school system. The long history of Philadelphia public schools as "racially identifiable" as either "white schools" or "black schools" cannot be gainsaid. As early as 1969 the School District was operating under a consent decree entered into with the Pennsylvania Human Relations Commission requiring it to remove the racial imbalance among teachers in its schools.

. . . .

In the context of repeated court and administrative orders to eliminate the racial identifiability of schools, the School District's plan to further this end by integrating faculty must be considered remedial as a vital part of the ongoing effort to achieve a unitary school system.

*Kromnick,* 739 F.2d at 904-05.

We believe the findings by the OCR of HEW, by the district court in the District of Columbia in *Brown v. Weinberger* and the Attorney General's certification underlying the consent order in *United States v. South Bend Community School Corporation* to be sufficient to remedy any inadequacies there might be in the findings made by the Board of Trustees in its series of meetings in 1978 leading up to adoption of Resolution 1020. Thus the no minority layoff provision is adequately supported. Indeed, we agree with the Eighth Circuit that on these facts the question "is not even close." To require more would be to burden the pursuit of racial equity beyond all reason.

**B.**

The next factor to be considered in the constitutional challenge is whether the no minority layoff provision is "somehow directed" toward the achievement of the School Corporation's interest in remedying past discrimination. In the period since the Supreme Court's decisions in *Bakke* and *Fullilove* a number of circuits have developed principles, based on the underlying concerns of the various Justices' opinions, for determining whether the challenged voluntary affirmative action plan is sufficiently related to the governmental objective of remedying past discrimination. *See, e.g., Kromnick v. School District of Philadelphia,* 739 F.2d at 903-04; *South Florida Chapter v. Metropolitan Dade County,* 723 F.2d 846, 851-52 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Bratton v. City of Detroit,* 704 F.2d 878, 885-87 (6th Cir.), *modified in other respects,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *Valentine v. Smith,* 654 F.2d at 510; *see also Paradise v. Prescott,* 767 F.2d 1514, 1530-32 (11th Cir.1985); *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1157 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985); *United States v. City of Alexandria,* 614 F.2d 1358, 1366 (5th Cir.1980).

We agree with the recent statement of the Eleventh Circuit that "the differences between the various approaches are more of phraseology than of substance." *Paradise v. Prescott,* 767 F.2d 1514, 1532 (11th Cir.1985).[19] In any event, we need not

---

**19.** The Eighth Circuit, for example, held in *Valentine v. Smith* that the plan must be "substantially related" to the objective of remedying past discrimination. 654 F.2d at 510. The court then defined "substantially related:"

A race-conscious affirmative action program is substantially related to remedying past discrimination if (1) its implementation results or is designed to result in the hiring of a sufficient number of minority applicants so that the racial balance of the employer's work force approximates roughly, but does not unreasonably exceed, the balance that would have been achieved absent the past discrimi-

nation; (2) the plan endures only so long as is reasonably necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or invidiously trammel their interests.

*Id. Valentine* has been cited approvingly by a number of circuits in this context. *Palmer v. District Board of Trustees,* 748 F.2d 595, 600 n. 14 (11th Cir.1984); *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1157 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985); *Morgan v. O'Bryant,* 671

choose among them, because a review of the evidence convinces us that the no minority layoff provision was reasonable and not merely "somehow directed" but essential and crucial to the achievement of the affirmative action policies of Resolution 1020, and so would survive scrutiny under any of these standards.

First, the provision did not stigmatize any of the white teachers who were laid off. The layoff was not related to merit but was determined by the provision and other aspects of seniority. Thus the teachers who were laid off were not stamped as inferior. *Bakke*, 438 U.S. at 371, 98 S.Ct. at 2789 (Brennan, White, Marshall and Blackmun, JJ. opinion); *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777 (Burger, C.J. opinion); *Wygant v. Jackson Board of Education*, 546 F.Supp. 1195, 1202 (E.D.Mich. 1982), *aff'd*, 746 F.2d 1152 (6th Cir.1984),

*cert. granted*, — U.S. —, 105 S.Ct. 2015, 85 L.Ed. 2d 298 (1985). Indeed, the teachers laid off are no more stigmatized than any employees laid off for lack of seniority under any other contractual seniority system.[20]

Second, the provision does not require the retention of unqualified teachers. *Bratton v. City of Detroit*, 704 F.2d at 891; *Valentine v. Smith*, 654 F.2d at 511; *United States v. City of Miami*, 614 F.2d 1322, 1340 (5th Cir.1980); *Wygant v. Jackson Board of Education*, 546 F.Supp. at 1202.

Third, the provision did not require the layoff of all white teachers. The forty-eight teachers who would not have been laid off but for the provision amounted to 3.77% of the faculty of 1274. Thus, the provision did not invidiously trammel the interests of the white teachers or act as an absolute bar to their employment. *Fulli-*

---

F.2d 23, 28 (1st Cir.), *cert. denied*, 459 U.S. 827 & 881, 103 S.Ct. 62 & 178, 74 L.Ed.2d 64 & 146 (1982). Indeed, in *Morgan* the First Circuit stated that the First, Fifth, Sixth and Eighth Circuits were "substantially in accord" on the proper test to be applied. *Morgan v. O'Bryant*, 671 F.2d at 28.

The Sixth Circuit follows the Brennan plurality in *Bakke* and requires that the remedial measure be "reasonable." *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 694 (6th Cir.1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); *see Bratton v. City of Detroit*, 704 F.2d at 885 & 887. "Reasonableness" is determined by examining the facts of the case to see "whether any discrete group or individual is stigmatized by the program and whether racial classifications have been reasonably used in light of the program's objectives." *Bratton v. City of Detroit*, 704 F.2d at 887; *see Detroit Police Officers' Ass'n v. Young*, 608 F.2d at 694; *see also Wygant v. Jackson Board of Education*, 746 F.2d at 1157 ("test asks whether the affirmative action plan is 'substantially related' to the objectives of remedying past discrimination and correcting 'substantial' and 'chronic' underrepresentation").

The Fifth Circuit requires that the plan must be "reasonably related" to the interest in remedying discrimination, and considers three factors: (1) whether the remedial relief is temporary and will terminate when the manifest racial imbalances have been eliminated, (2) whether the relief establishes an absolute bar to the advancement of whites; and (3) whether the relief will benefit only qualified persons. *United States v. City of Alexandria*, 614 F.2d 1358, 1363–66 (5th Cir.1980); *see Paradise v. Prescott*,

767 F.2d at 1531 (11th Cir.1985); *see also United States v. City of Miami*, 614 F.2d 1322, 1335–38 (5th Cir.1980), *rehearing en banc*, 664 F.2d 435 (5th Cir.1981).

The Third Circuit has held that the relevant factors in reviewing a race conscious plan are "(1) the importance and validity of the remedial aim, (2) the competence of the agency to choose such a remedy, and (3) the tailoring of the remedy so as to limit the burden suffered by others." *Kromnick v. School District of Philadelphia*, 739 F.2d at 904.

The Eleventh Circuit positions are detailed in *Paradise v. Prescott*, 767 F.2d at 1531–32 (reviewing *South Florida Chapter v. Metropolitan Dade County*, 723 F.2d 846, 851–52 (11th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 220, 83 L.Ed.2d 150 (1985); *Valentine v. Smith*; and *United States v. City of Alexandria*, 614 F.2d 1358, 1366 (5th Cir.1980)).

**20.** As a general matter, though we need not rely on it here, the self-esteem of whites is not endangered by attempts to remedy past acts unfairly militating in their favor. The purpose of such programs is to aid blacks, not to exclude whites. The socially dominant white majority is not being subject to what amounts to constitutionally invidious stigma. *Bratton v. City of Detroit*, 704 F.2d 878, 891 (6th Cir.), *modified in other respects*, 712 F.2d 222 (6th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *see* T. Nagel *Equal Treatment and Compensatory Discrimination*, 2 PHIL. & PUB.AFF. — (1973), *reprinted in* EQUALITY AND PREFERENTIAL TREATMENT 3 (Cohen, Nagel & Scanlon, ed. 1977).

*love,* 448 U.S. at 484, 100 S.Ct. at 2777; *Valentine v. Smith,* 654 F.2d at 511; *United States v. City of Miami,* 614 F.2d at 1340; *Wygant v. Jackson Board of Education,* 546 F.Supp. at 1202; *see Weber,* 443 U.S. at 208–09, 99 S.Ct. at 2729–30. We agree with the district court in *Wygant* that it is difficult to conceive how (absent a claimed breach of the duty of fair representation) a plan which was voluntarily adopted by the membership of the NEA-South Bend, a majority of whom were white, could invidiously trammel their interests. 546 F.Supp. at 1202. In fact, this factor is one of the most decisive in validating the challenged plan.

Fourth, the provision was a temporary measure not designed to maintain a particular racial balance in the teaching staff. *See supra* part III B. *Bratton v. City of Detroit,* 704 F.2d at 892; *Valentine v. Smith,* 654 F.2d at 511; *United States v. City of Miami,* 614 F.2d at 1340.

The teachers' most serious claim is that a less burdensome layoff procedure would have been possible, and so the provision is not reasonable. It is true that considered in the abstract it would have been possible to lay off by seniority excluding the provision and rehire black teachers first, or to engage in proportional layoffs (as is now the case under the revised layoff provision). But the provision was designed to further the goals of Resolution 1020 and prevent the loss of the gains that had been made.

If layoffs had been effected without the provision, more than one-quarter (27.3%) of the school district's black teachers would have been laid off, and almost one-third (32.9%) of the laid off teachers would have been black. Def. Ex. F–1. The reason for this is the usual and distressing one that a disproportionate percentage of black teachers had been only recently hired. Without the provision the percentage of black teachers would have dropped from 13.0% to 10.8%, almost back to what it had been when Resolution 1020 was adopted. At the same time the percentage of black students had risen from 22.1% to 25.8%. Def. Ex. E–1. The plaintiffs apparently concede that a straight percentage layoff provision would have been reasonable. *See* Pl. Br. at 14. Layoffs pursuant to such a provision would have kept the percentage of black teachers at 13.0%, while the actual layoffs pursuant to the no minority layoff provision increased the percentage to 13.8%. We do not believe this minor difference makes the provision constitutionally unreasonable. This conclusion rests on the fact that Resolution 1020 required that the School Corporation strive to exceed each year the minority employment figures of the previous year. *Cf. Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 485 (6th Cir.1985) (rejecting as "entirely too speculative" the argument that a district court may not approve a consent decree adopting an affirmative action plan "simply because other measures *may,* over the course of future years, achieve the same result" (emphasis in original)); *Kromnick v. School District of Philadelphia,* 739 F.2d at 907 ("No Supreme Court opinion has required a competent agency to undergo a convassing of alternatives as a constitutional prerequisite for a legitimate remedial action. The various opinions in *Fullilove* either expressly reject any requirement that the remedy chosen be the least restrictive, or adopt a far less rigorous standard." (citations omitted)).

For all of these reasons we believe that the provision sufficiently furthered the School Corporation's legitimate objective.[21]

---

**21.** The dissent's reliance on *Donovan v. Illinois Education Ass'n,* 667 F.2d 638 (7th Cir.1982), and *Oliver v. Kalamazoo Board of Education,* 706 F.2d 757 (6th Cir.1983) is misplaced. *Donovan* was a labor case in which we found a violation of section 401(e) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481(e). That "case [did] not involve the legality of affirmative action.... Whatever may be the status of affirmative action under civil rights statutes or the equal protection clause of the Fourteenth Amendment, those laws [were] not involved in [that] litigation." *Donovan,* 667 F.2d at 640. Anything from *Donovan* on which the dissent would rely today is mere dicta. *Oliver* involved a *court-imposed* layoff system that overrode a bona fide seniority system over the objections of one of the

Because it was also supported by adequate findings of discrimination, it was valid and survives constitutional challenge.

V.

■■■■ We now turn to the plaintiffs' state law challenges to the no minority layoff provision. Having found no merit to the teachers' federal claims, the district court declined to exercise pendent jurisdiction over the state claims.[22] The district court correctly noted that the decision whether to entertain the state law claims was discretionary, citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), even after a trial on the merits in which the federal claim has not been proven, citing *Delcambre v. Delcambre*, 635 F.2d 407 (5th Cir.1981) (per curiam). The court then reasoned as follows:

> The crux of the state claims in this case is the impact of Article XXIII, § 9 on the plaintiffs' seniority rights under the Indiana Teacher Tenure Act. The question of whether an affirmative action plan violates the Teacher Tenure Act has not been addressed by Indiana courts. Therefore, where, as here, the proper resolution of the state law question is unclear, a federal court may properly decline to address the pendent issues. Any judgment by this court on this question would be purely advisory and of no precedential value to the state court.

593 F.Supp. at 1233 (citation omitted). On appeal plaintiffs merely restate their argument concerning the merits of their state claims. The correct standard of review is abuse of discretion, however, not error on the merits. We do not believe the district court abused its discretion in declining to

exercise pendent jurisdiction over the state claims and dismissing them without prejudice. *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *Delcambre v. Delcambre*, 635 F.2d at 408.

An affirmative action plan is a serious measure. It must not be entered into without careful consideration of the need for and the burdens of the plan. But the plan involved here, Article XXIII, Section 9 of the 1980–83 collective bargaining agreement between the South Bend School Corporation and the NEA-South Bend, was carefully considered and reasonable under the circumstances. We have concluded that it did not violate either Title VII or the Equal Protection Clause of the Fourteenth Amendment. We have also concluded that the district court did not abuse its discretion in dismissing the pendent state claims. For the reasons given above, the order of the district court is AFFIRMED.

POSNER, Circuit Judge, dissenting.

The public school system of South Bend, Indiana laid off 146 teachers. All were white; 48 had more seniority than blacks not laid off; two years later 20 of the 48 had not yet been recalled. The school system was carrying out a policy of not laying off any blacks. This was racially discriminatory state action and the question is whether it denied the 48 white teachers the equal protection of the laws, in violation of the Fourteenth Amendment.

Discrimination against whites, when connected in some way, however tenuously, to the history of discrimination *by* whites, is called "affirmative action," or, less euphemistically, "reverse discrimination." The debate over its legality is bounded by two positions. The first is that, like dis-

---

parties to the litigation. The court explicitly distinguished voluntary affirmative action plans. *See Oliver*, 706 F.2d at 763 n. 6 & 765 n. 9. In *Wygant v. Jackson Board of Education*, which the dissent concedes supports our position, the Sixth Circuit stated that *Oliver* simply anticipated *Stotts*. *Wygant*, 746 F.2d at 1157–59. *Oliver*, like *Stotts*, was distinguishable from *Wygant*, and is from this case as well.

22. The plaintiffs' state-law claims below were, essentially, challenges to "(1) the validity of the School Board Meeting of June 1 and 2, 1982; (2) the Board's decision with respect to seniority claims advanced by plaintiffs Jan Meiss, Jeanne Reabarger, Patricia Toth and Bonita Ujdak; and, (3) the validity of the 'no minority layoff' clause under the Teacher Tenure Act, I.C. § 20–6.1–4–1 *et seq.*" 593 F.2d at 1232–33.

crimination against members of minority groups, it is illegal per se; that since rights against discrimination are personal rather than group rights, as emphasized in *Connecticut v. Teal,* 457 U.S. 440, 453–54, 102 S.Ct. 2525, 2533–34, 73 L.Ed.2d 130 (1982), membership in a racial group confers no entitlements; and that to hold that there is good racial discrimination and bad racial discrimination and that only the bad is unlawful would make the antidiscrimination principle too contingent, too empirical, too subject to judicial caprice, and at once too heedless of the legitimate rights of white people and too condescending toward black people. The second position is that reverse discrimination is permissible if reasonable in all the circumstances; that the law should be capable of differentiating among types of discrimination that differ in history, motivation, and consequence; and that inflexible commitment to the idea of a color-blind Constitution would prevent black people from overcoming the effects of centuries of severe discrimination.

The choice between these positions is as contentious as any issue facing the nation. The Supreme Court has avoided it by steering a middle course, thus obliging us to do likewise. The Court has refused to condemn reverse discrimination outright, as discrimination against blacks and other minority groups is condemned. See, e.g., *Fullilove v. Klutznick,* 448 U.S. 448, 482–83, 100 S.Ct. 2758, 2776–77, 65 L.Ed.2d 902 (1980). But it has not treated it as permissively as purely "economic" discrimination, such as exempting individuals from a personal property tax, is treated. Compare *id.* at 519, 100 S.Ct. at 2795 (Marshall J., concurring), and *Regents of University of California v. Bakke,* 438 U.S. 265, 358–62, 98 S.Ct. 2733, 2782–85, 57 L.Ed.2d 750 (1978) (separate opinion of Brennan, J.), with *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359–60, 93 S.Ct. 1001, 1003–04, 35 L.Ed.2d 351 (1973). All of the Justices seem troubled by state action that draws racial lines, even if the benefited group is a traditional target, rather than a practitioner or a beneficiary, of discrimination. Yet all seem also to believe that reverse discrimination is less vicious and less harmful than discrimination against the traditionally discriminated against. For even the severest critics of reverse discrimination do not object to programs for recruiting or training blacks and other minority persons, though such programs create a racial preference, and though a program for recruiting or training whites as such would be viewed with the gravest suspicion.

So in evaluating what South Bend has done to these white teachers we are not permitted by our judicial superiors either to condemn it out of hand as illegal discrimination because its motivation was racial or to evaluate it under a standard of reasonableness whereby anything goes that is not clearly arbitrary. We have to look at it critically—to give it, in Justice Brennan's words, "strict and searching" review, *Regents of University of California v. Bakke, supra,* 438 U.S. at 361–62, 98 S.Ct. at 2784–85 (separate opinion)—and to adjudge it a denial of the equal protection of the laws if we cannot say that it is a well-tailored means to a clearly lawful end.

There are two possible ends to which the laying off of these teachers might conceivably be a proper means. The first is to remedy a violation of law. Suppose South Bend had formerly refused to hire black teachers, and to correct the violation it not only hired blacks but jumped them ahead of some white teachers on the seniority roster. This remedy could be defended on the ground that, but for the city's past discrimination, the black teachers whom it had hired recently would have been hired earlier and would thus have accumulated as much seniority as white teachers— though the city would have to prove that the particular black teachers given super-seniority had in fact, as my example assumes, been victims of the city's past discrimination. See *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 2588, 81 L.Ed.2d 483 (1984). Applied to this case, the defense would fail for two reasons. There is no evidence that the particular black teachers who received su-

perseniority had ever been discriminated against by the South Bend school system. And the city put the black teachers ahead of *all* the white teachers, thus giving them more seniority than it is plausible to imagine they would have accumulated had there never been discrimination against blacks—giving them, in fact, what they could have expected to get only in a world where whites were systematically discriminated against.

But forget all this; for the more fundamental point is that this is not a case that arises out of discrimination in hiring, whether against the particular black teachers who kept their jobs when more senior whites were laid off or against any other black candidates for teaching jobs in the South Bend public schools. South Bend used to discriminate against black teachers, it is true, but the discrimination lay in assigning them to schools with a predominantly black student population, not in refusing to hire them. The scanty references in the record to "recruitment" are to the fact that until the 1970s the school board did not make aggressive efforts to recruit blacks. It did not make agressive eforts to recruit anyone. Affirmative action in hiring is sometimes permitted, but it is not mandatory, and its absence does not equate to refusing to hire qualified black applicants. Of such refusal I can find no indication in the record except an unelaborated, unsubstantiated, unsworn statement made by a black community activist at a public meeting of the school board. My brethren describe this statement as "testimony"; it is not testimony, and there is nothing else.

My brethren may think that any school system that segregated blacks and whites must have discriminated against blacks in hiring too; but actually there need be no correlation between the two forms of discrimination. Indeed, with complete segregation of whites and blacks, and identical student-teacher ratios in black and white schools, the ratio of black to white teachers would be equal to the ratio of black to white students—which as a matter of fact is the school board's goal in this case. There might be no hiring discrimination even if, with segregated schools, the ratio of black to white teachers was lower than the ratio of black to white students, as apparently it has been throughout South Bend's history. Maybe there were fewer qualified black teachers than white teachers; the school system therefore hired fewer black teachers relative to black students than white teachers relative to white students; so the student-teacher ratio was higher in the black than in the white schools. There would, if the schools were racially segregated, be discrimination, but not in hiring—a distinction fundamental to this case.

The rational remedy for the discrimination in which South Bend engaged—for school segregation as distinct from refusal to hire qualified black teachers—is not superseniority for black teachers but equal assignments for black teachers. It is therefore not surprising that the consent decree entered in 1980 contained no provision for superseniority. The defendants' counsel conceded at oral argument that no competent body had ever made a finding that the school board had turned down a qualified black applicant for a teaching job. I do not find this important concession remarked in the majority opinion.

Rather than discriminating against black teachers in hiring, South Bend has discriminated in their favor since before the consent decree was signed. This is a more pertinent fact than what Indiana did to blacks when it was a territory, or before the Civil War, or even in 1949. Whatever its past failure in the area of aggressive recruiting of blacks, by 1978 South Bend (we were told at argument) was hiring three times the fraction of black applicants for teaching jobs as of white applicants. True, the fraction of black teachers was not yet so high as the fraction of black students, but that does not prove discrimination, any more than the ratio of the percentage of black teachers (7 percent) to the percentage of black students (16 percent) in 1968 proved discrimination—in hiring. The proper comparison is not between the percentages of black teachers and

black students, any more than the ratio between the percentage of black employees of soft-drink vendors and the percentage of soft-drink buyers who are black would be relevant in a suit charging the vendors with discrimination. The proper comparison is between the number of black teachers hired by the school district and the number of qualified black teachers in the relevant labor market, see *Hazelwood School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)—a number that appears nowhere in this record but that in the absence of evidence is best approximated by the number of black teaching applicants. And in 1978 a black applicant had three times the chance of being hired as a white applicant. It appears, then, that two years before the consent decree went into effect South Bend was hiring a larger fraction of qualified blacks than qualified whites—and there is no evidence that it had ever refused to hire qualified blacks. The record will not sustain an argument that superseniority for black teachers was necessary to eliminate a legal violation or even keep the school board out of legal trouble, for there is no evidence of a *relevant* violation, actual or arguable, past or present. The lack of "fit" between the discrimination found and the remedy prescribed is complete, and is not to be brushed aside by reference to the history of school segregation in Indiana; for, as I have tried to emphasize, segregating the schools and refusing to hire qualified black teachers are logically, and for all we know factually, distinct forms of racial discrimination.

The other ground for giving black teachers superseniority might be to preserve "role models" for the black students in South Bend's public schools, the theory being that scholastic underachievement is one of the legacies of discrimination against blacks. Although the defendants have made little effort to establish this ground, I am willing to give them every benefit of the doubt and therefore consider whether there is any possible basis for upholding the grant of superseniority by reference to the need for black role models.

At the time of the consent decree 11 percent of the teachers in the South Bend public schools were black, which was half the percentage of black students and was thought to be too low. To raise this percentage it was decided that half of the new hires should be black. By the time the layoffs began 13 percent of the teachers were black, and but for the grant of superseniority in 1982 that percentage would have fallen back to 11 percent because many of the black teachers had been hired recently and therefore had less seniority than white teachers.

It is plausible both that black teachers on average relate better to black students than white teachers do and that a significant presence of black teachers in a school is necessary to legitimize educational achievement in the minds of black students who come from educationally deprived homes. But it does not follow that every school with black students ought to strive for the identical percentage of black teachers at whatever cost to white teachers. If these white teachers, who so far as appears are neither practitioners nor beneficiaries of racial discrimination and who I am sure are not the economically most secure members of the community either, are to be sacrificed as pawns in the struggle for racial justice because they are, as my brethren put it, members of "the socially dominant white majority," there should be some competent evidence—educational, psychological, or sociological—that their sacrifice is necessary. Evidence, for example, that the difference between 11 percent of the teachers being black in a school 26 percent of whose students are black and 13 percent of the teachers being black is educationally relevant. There is no such evidence and there are no relevant findings of fact by the district judge, who based decision on his earlier decision in a similar case, the *Janowiak* case, which another panel of this court reversed in a decision that my brethren are at pains to distinguish.

Even the point of comparing the percentage of teachers who are black with the percentage of students who are black, rath-

er than the number of black teachers with the number of black students, is not apparent, and of course is not explained. Comparing the number of black teachers to the number of black students is relevant to the issue of role models for black students because it indicates how often a black student is likely to encounter a black teacher. But comparing the percentage of black teachers to the percentage of black students merely generates paradoxes. Suppose that as a result of a sharp decline in the number of teachers (because of layoffs), with no decline in the number of students, the ratio of black teachers to black students fell because some black teachers had been laid off, but the percentage of black teachers (that is, black teachers as a percentage of all teachers) rose because a higher fraction of white than of black teachers had been laid off. The number of black role models would have declined yet under the method of calculation used by the defendants the black students would be deemed better off. Actually they would be worse off both because the student-teacher ratio was higher, so that each student could expect less individual attention, and because there would be fewer black teachers for the students to look up to.

Or suppose that for some reason the number of white students in the school system increased and the number of black teachers, black students, and white teachers remained the same. The percentage of black teachers would be the same but the percentage of black students would be lower (because the percentage of white students would be higher), so the ratio of the two percentages would be higher. For example, if the number of white students in the public schools of South Bend doubled, the percentage of black teachers would be roughly the same as the percentage of black students (the latter percentage having declined to roughly half of what it had been), and by the defendants' reasoning the black students would have their full quota of role models. To be concrete, suppose we start with 9 white teachers, one black teacher, 80 white students, and 20 black students, so that the percentage of black teachers is 10 percent but the percentage of black students 20 percent, and then we add 100 white students. This would bring down the percentage of black students to 10 percent, so that under the defendants' view the black students would now have enough black role models, for there would be the same percentage of black teachers as of black students. I am baffled by this logic. The black students would have neither more black teachers nor a higher percentage of black teachers; they would just have more white fellow students.

The record contains what I have said is the more relevant comparison—the ratio of black teachers to black students, which ranged from 1 to 40 to 1 to 60 in the relevant period. But the record contains no interpretation of these ratios. I would like to know how many black teachers the South Bend schools would have to have in order to guarantee every black student at least two black teachers a year, and I should like to have the opinion of an educator or a sociologist as to whether black students would benefit significantly from having more role models than that. Eleven percent, which is what the percentage of black teachers in the South Bend public schools would have been if they had not been given extra seniority, is the approximate percentage of blacks in the nation's population. It is not obvious to me why a higher percentage is necessary to provide black students with enough role models, even if the students happen to attend a school where the percentage of blacks exceeds the national average. Again I emphasize the lack of any evidence on the point.

There is an insidious as well as arbitrary quality to "role model" arguments that ought to make us insist that they be backed by evidence. Supposing that black male students need black male teachers as role models, should preference be given to black male over black female applicants for teaching jobs? Are whites entitled to white role models in schools where black or Asian or Hispanic teachers are overrepre-

sented? Must the teaching staff of every public school in the United States reflect the racial, ethnic, sexual, and religious composition of the student population of the school? Should a school system assign only black teachers to a school that has only black students? See *Morgan v. Kerrigan*, 509 F.2d 580, 596 (1st Cir.1974). Would not the "role model" argument, carried to an extreme, carry us back to where Indiana was before 1949, with a system of segregated schools, in which blacks attended schools staffed (presumably) by black teachers? In order to answer these heavily rhetorical questions "no" yet accept the defendants' role-model argument in this case we need some evidence, and have none.

Even if the defendants had made a case for giving black teachers some extra seniority, a policy of laying off *only* white teachers is hard to describe as the equal protection of the laws, if as I assume the equal protection clause requires careful scrutiny of discrimination directed against any race, including the white race, though perhaps less careful than if the group discriminated against were smaller and less secure. The defendants' policy amounts to saying that every black teacher shall have more seniority than any white teacher; that so far as seniority is concerned the blacks shall constitute a separate and superior caste. This seems to me a little like giving each black citizen of South Bend two votes in elections to the school board compared to one for whites—a discrimination that I cannot imagine any court upholding.

The defendants' policy has the curious effect of increasing the percentage of black teachers in the public schools of South Bend merely because economic conditions have worsened. Suppose the South Bend schools had had to lay off half their teachers; since no blacks could be laid off, the percentage of blacks would have zoomed from 13 to 26 percent. The actual number of layoffs was not so great, so that while the percentage of black teachers did increase, the increase was only from 13 to 14 percent. Still, laying off only whites seems a pretty weird mechanism for creating more black role models. Even if the need for adequate role models required that the fraction of teachers who are black equal the fraction of students who are black, it does not follow that the proper means to that goal is never to lay off a black. An alternative would be to hire an even higher fraction of blacks. The adverse effect on the job security of whites would be less.

I am not much comforted by the point that the provision for racial preference expires with the collective bargaining agreement, and thus lasts only three years unless renewed. Now as a matter of fact it has been renewed, though only for a year. The union and the school system are thinking of moving toward a system of racially proportional layoffs, so that the fraction of black teachers in the system would not rise because of layoffs. This would still mean giving blacks more seniority than whites on purely racial grounds, though not as much more as under the 1980 agreement. So the discrimination will persist, indefinitely perhaps, though in a somewhat milder form than in its first four years. Collective bargaining agreements, be it noted, almost always lapse after three years, but no one is likely to argue that on that account unions and employers should be free to write discriminatory provisions into them.

Nor am I persuaded that since the union voted to give the blacks superseniority, it must be okay, though my brethren regard this point as "one of the most decisive in validating the challenged plan."

1. Under the collective bargaining arrangements between South Bend and the teachers' union, only union members can vote on whether to ratify a proposed collective bargaining contract. A teacher who is not a member of the union has no voice, and 28 percent of the teachers, including some of the plaintiffs, were not members of the union. If all the union members voted and fewer than 70 percent of them voted for the contract, then a minority of all the teachers voted for it. We do not know what the vote was.

2. Even the union members do not vote on particular provisions, such as the provision that gives blacks superseniority; they vote the whole contract up or down. A majority might have wanted the racial provision deleted yet have voted for the contract because they liked the remaining provisions or because they were fearful of working without a contract. This is conjecture, of course; but the burden of justifying racial discrimination is on those who do the discriminating, the defendants in this case, who presented no evidence of consent by the victims of the discrimination beyond the bare fact of ratification of the collective bargaining contract.

3. The provision on minority rights that appears in the contract as ratified is worded differently from the provision that was in the draft of the contract submitted to the members of the union to vote on. The record does not contain the original wording.

4. We do not know the vote on the contract, as I said, but it was not unanimous, and it is no answer to a charge of racial discrimination that an electoral majority supports it. See *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021–1022, 39 L.Ed.2d 147 (1974). Suppose a majority of the black members of the union had voted to lay off blacks first, regardless of seniority. Would this mean that other black members could not complain of racial discrimination? That black nonmembers could not? My brethren say that "the teachers were not oblivious of these possibilities [i.e., that they might lose their jobs] when they voted for the provision." I would word it differently. I would say, more accurately than my brethren, that the teachers *who voted for the collective bargaining contract* were, presumably, not oblivious to the possibility that they might lose their jobs because of the provision in the contract granting superseniority to blacks. We know that some of the plaintiffs did not vote for the contract, because they were not members of the union and therefore were ineligible to vote. We do not know how many, if any, of the plaintiffs who were members of the union voted for the contract and as to those who did vote for it—if there were any plaintiffs who did— we do not know whether they supported superseniority for blacks or opposed it but thought that on balance it was better to have a discriminatory contract than to have no contract.

To take away a public employee's job because of his racial identity is a serious step. It ought not be taken as lightly as it was here. This is not to say that it is the worst form of reverse discrimination that can be imagined. Hiring unqualified blacks in lieu of qualified whites is a worse affront to the merit principle and to social efficiency. For seniority is not a meritocratic principle, so that laying off more senior ahead of less senior workers need not reduce the quality of the work force, and may increase it. But job rights are precious commodities to workers (the Supreme Court, of course, views tenure, which these plaintiffs had, as "property" within the meaning of the due process clauses of the Fifth and Fourteenth Amendments, see, e.g., *Perry v. Sindermann*, 408 U.S. 593, 599, 601–02, 92 S.Ct. 2694, 2698, 2699–2700, 33 L.Ed.2d 570 (1972)), and the deprivation of those rights on nakedly racial grounds is a sufficient affront if not to the merit principle than to the ideals of racial equality and of judgment in accordance with individual worth to require something more than the slapdash effort at rationalization attempted by the defendants in this case; at least our judicial superiors seem to believe that.

It is not enough that South Bend once discriminated against black teachers on grounds unrelated to anything for which superseniority would be a rational corrective and that there are valid educational reasons for wanting to expose black students to black teachers. This would be enough to justify efforts to recruit more black teachers but it is not enough to justify taking away (whether temporarily or permanently, depending on economic conditions) white teachers' jobs. Cf. *Kromnick v. School District*, 739 F.2d 894, 902 (3d

Cir.1984). For that a more particularized showing of need is required than was attempted.

My brethren's scrutiny of the defendants' conduct is not "strict and searching"; it is not brief, but it is casual, and although supported by the Sixth Circuit's decision in *Wygant v. Jackson Bd. of Educ.*, 746 F.2d 1152 (6th Cir.1984), cert. granted, —— S.Ct. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985), is inconsistent with the approach previously taken in this circuit, see *Janowiak v. Corporate City of South Bend*, 750 F.2d 557, 563–64 (7th Cir.1984), and *Donovan v. Illinois Education Ass'n*, 667 F.2d 638, 641–42 (7th Cir.1982), with the spirit of the Supreme Court's decisions in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), and *Firefighters Local Union No. 1784 v. Stotts, supra*, 104 S.Ct. at 2584, 2588, with an earlier Sixth Circuit decision, *Oliver v. Kalamazoo Board of Education*, 706 F.2d 757 (6th Cir.1983), and with the evident seriousness with which all of the Supreme Court Justices regard any form of racial discrimination. Even *Wygant* provides only limited support for the decision today. *Wygant* did not involve a policy of not laying off any blacks—it just provided that no higher percentage of blacks than of whites could be laid off—and the process for ratification of the collective bargaining agreement was not (so far as remarked in the opinions, anyway) flawed, as was the process here. No case before today has upheld so harsh a form of reverse discrimination. The plan of affirmative action upheld in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), for example, did not involve discharging any workers. But I shall not pretend that precedent dictates the outcome of this case. We must distill principles, and apply them. The principle I distill is that the kind of reverse discrimination involved in this case, which takes away job rights and not just job opportunities, requires careful and critical review; and it has not received it.

The harshness of the discrimination practiced in this case does not go completely unremarked by my brethren, but they do not draw the obvious conclusion, which is that the defendants ought to be required to show that this discrimination was necessary to achieve some clearly lawful end. My brethren remark the painful character of what the defendants have done to the plaintiffs, yes, but the only solace they offer these plaintiffs, who have lost their jobs, is to note that the loss is, for most of them anyway, temporary; that many white teachers, though not necessarily the plaintiffs, voted to give the blacks extra seniority; and that in any event the plaintiffs, being white, have not been "stigmatized" by being laid off. Although man does not live by bread alone, neither does he live by self-esteem alone, and it is small comfort to a person who loses his job as a result of discrimination in favor of a black to be told that he has, after all, the consolation of being white, that most of the people who have discriminated against him are themselves white, and that he may get his job back some day soon—though some of these plaintiffs have been waiting for three years. I am willing to accept that the equal protection clause means as a practical matter less for whites than for blacks but not that it means nothing at all, which if this decision stands will be the approximate situation in this circuit after today.